The appellant, Dennis Joe Gurganus, was convicted of murder during kidnapping in the first degree and murder during robbery in the first degree. The appellant was sentenced to life without parole.
The State presented evidence that the victim, David Cain, had a large amount of money in his possession on the date of the offense. The victim's brother testified that he believed that the victim had approximately $2,000 in his wallet, while the victim's nephew stated that he had examined the victim's wallet and noted that it contained three or four $50 bills and was thick with $20 bills. Another witness stated that he cashed a check for the victim for approximately $195 and observed a number of other bills in his wallet.
The victim owned a blue four-door Ford Gran Torino. In addition he purchased a light blue Pontiac Catalina at an automobile auction on June 30, 1984. He drove to his brother's store after the sale. George Ambrose, one of the victim's nephews, had accompanied the victim to the sale, for which the victim paid Ambrose $10. Ambrose thereafter drove to a fish fry with Bobby Joe McGraw, Craig Wade, and Jim Blackston, where they encountered the appellant and Randy Wade. Ambrose, McGraw, Blackston, and the appellant all testified at trial to the subsequent events. Their testimony is conflicting.
Ambrose testified that, while at the fish fry, the appellant stated that he only had $5. He further testified that they drank beer at the fish fry until 1:00 a.m., when they drove to the victim's brother's store, hereinafter referred to as "Cain's store." He testified that the victim's two cars were parked at the store and that the appellant walked up to the cars, hit one of them on the fender, and told the victim to get up; that "it wasn't time to go to sleep." The victim responded, "Leave me alone, I'm sick." Although the nature of the victim's illness was not explained, the State had presented other evidence that the victim's arm was in a sling. The group then left the store in order to drive Randy Wade home and then returned to the store. Ambrose further testified that, during the drive back to the store, the appellant remarked that the victim carried a lot of money, to which Ambrose replied, "Yeah." The appellant then stated, "Let's rob him." Ambrose further testified that Mark Wade stated, "Yeah, let's go for it," and the appellant then remarked, "No, that's George's [Ambrose's] uncle." Ambrose testified that Mark Wade and Bobby Joe McGraw then left the store. The appellant, Jim Blackston, and Ambrose remained, and Ambrose stated that just prior to his own departure, the appellant remarked that his friend's (the appellant's) tire was going flat. Ambrose testified that he did not see the appellant or Jimmy Blackston any more that night. Ambrose testified that he rode to the store with the appellant the following day, Sunday, and observed "an old looking single shot" gun in the appellant's car. *Page 172 
Bobby Joe McGraw testified that on Saturday night, after attending the fish fry, they drove to Cain's store and observed the victim's two cars. Thereafter, they left the store, and, when they returned, the appellant stated, "Let's rob the old man." Mark Wade responded, "Go for it." and the appellant stated, "No, that's George's uncle." He testified that he left the store with Mark Wade, went to a bar, and then went to Birmingham. He further testified that on the following Monday, the appellant and he went to the appellant's house to get a rifle and he observed a shotgun on the bed. The appellant was driving a car which he had just purchased. The following Friday, the appellant asked McGraw to ride to Jasper with him in order to buy some tags for another car that the appellant had just purchased. On the way to Jasper, they had a conversation concerning the news that the victim had been found dead. The appellant stated that he had heard that Ambrose and McGraw were responsible for his death. When McGraw stated that he did not do it, the appellant remarked, "I didn't either. By God, if they get me in trouble I'm going to kill the son of a bitch when I get out of the pen." McGraw testified that he neither observed the appellant beat on the victim's car, nor heard him tell the victim to get up.
Jim Blackston testified that after the group returned to Cain's store on the night in question, the appellant was talking about robbing the victim. He testified that the appellant asked Ambrose how much money the victim had. Ambrose responded that the victim had more than $1,000. He further testified that the appellant then asked him if he would like to help rob the victim and Mark Wade responded that he would help in return for half of the money. He further testified that Ambrose then told the appellant that they should not rob the victim because he was Ambrose's uncle. He testified that McGraw and Mark Wade then left the store, leaving Ambrose, the appellant, and him. Thereafter, Ambrose left and Blackston asked the appellant for a ride home. However, the appellant stated that he had a flat tire, which was verified by Blackston. The appellant then asked Blackston if he would help him rob the victim. He also asked him if he needed any money, to which Blackston replied that he did not. The appellant then removed a shotgun from the trunk of his car and approached the side of the victim's car and opened the car door. When the victim awoke, the appellant placed the shotgun in the victim's face and stated that he wanted his money and his keys. The victim gave the appellant his keys, which the appellant gave to Blackston, and the appellant told Blackston to drive. The appellant told the victim to give him his money and everything that was in his pockets. Blackston testified that the appellant kept cocking the gun and then releasing it. The appellant used the gun barrel to knock out the inside car light. Thereafter, the appellant instructed Blackston to turn off the road and stop the car. The appellant got out of the car with the gun and ordered the victim to get out also. The victim then stated that if the appellant would "let him ride out" he would give the appellant more money. The appellant told the victim to keep walking, after which, Blackston stated, he heard a gunshot. The appellant got back in the car and told Blackston that he had killed the victim by shooting him in the head. They ran to Clarence Blackston's home. Thereafter the victim's car battery failed to work. After waking Clarence, they traded the battery for the one in his truck; however, the car still would not "crank." Clarence, therefore, pushed the car to a location where the appellant took the battery, the spare tire, jack and lug wrench, and two bottles of whiskey from the car, as well as his shotgun, and placed these items in Clarence Blackston's truck. The appellant cut the gasoline line on the car, collected the gasoline, and poured it on the car, and set the car on fire. The appellant and Jim Blackston then took the victim's other car, removed the water pump, alternator, fan, fan belts, spare tire, jack, lug wrench, and battery. The appellant then set that car on fire also. Blackston testified that the appellant used a jug, which he identified in court, to pour the gasoline. Subsequently, the appellant used one of the tires from one of the victim's cars to replace his *Page 173 
flat tire and replaced his water pump with the one taken from one of the victim's cars. Blackston testified that several days later the appellant told his mother and grandmother that they were going to work in Texas. However, Blackston stated that he was not planning to go to Texas. He testified that he did not see the appellant thereafter.
Clarence Blackston also testified that he followed the appellant and Jim Blackston to retrieve the automobile parts and set the cars on fire. He further testified that Jim Blackston stated that the appellant had shot the victim and that the appellant stated that the victim had "came at him" with a knife. Evidence was introduced concerning conflicting testimony given by Clarence Blackston.
The State also presented evidence that the appellant "sold" someone a battery and never returned to collect the payment. The battery was later delivered to the Tuscaloosa County Homicide Unit. Furthermore, the appellant's employer testified that after a discussion with the appellant concerning the victim's body being found, the appellant quit his job. The employer saw the appellant later and told him that he owed the appellant $60, but the appellant never returned to collect the money. The State also presented the testimony of a witness who sold the appellant a car for $100 and stated that the appellant paid him in $20 bills from a roll of twenties he pulled from his pocket. The appellant told him that he received the money from a turkey shoot.
The appellant testified that upon returning to Cain's store on the night in question, Ambrose tapped on the victim's car and told him to get up. He further testified that although someone mentioned robbing the victim, he stated that they should not rob him because he was George's uncle. He further testified that, later, Jim Blackston and he left and spent the night at the appellant's house. The appellant testified that he had acquired the automobile parts while he was in Texas. He testified that he did not shoot the victim and knew nothing about the murder.
 I
The appellant argues that his conviction should be reversed because it was not based on credible evidence. Although the appellant argues that the testimony of the State's witnesses had weaknesses, discrepancies, and conflicts, "[t]his Court is not a trier of fact." Mosley v. State, 461 So.2d 34, 36
(Ala.Cr.App. 1984). Any doubt, vagueness, or inconsistency in the testimony of a witness properly goes to the credibility of the witness and is thus a question for the jury. Neal v. State,460 So.2d 257, 261 (Ala.Cr.App. 1984); Taylor v. State,408 So.2d 551 (Ala.Cr.App. 1981), cert. denied, 408 So.2d 555 (Ala. 1982).
 "It is not the province of this court to reweigh the evidence. Cumbo v. State, 368 So.2d 871
(Ala.Cr.App. 1978), cert. denied, 368 So.2d 877
(Ala. 1979). The weight of the evidence, the credibility of the witnesses, and inferences to be drawn from the evidence where susceptible of more than one rational conclusion, are for the jury alone. Willcutt v. State, 284 Ala. 547, 226 So.2d 328 (1969). As this court stated in Scroggins v. State, 341 So.2d 967 (Ala.Cr.App. 1976), cert. denied, 341 So.2d 972 (Ala. 1977):
 " 'Where there is legal evidence from which the jury can by fair inference find the defendant guilty, this court has no right to disturb the verdict of the jury. Whether there is such evidence is a question of law, [and if there is,] its weight and probative value are for the jury. Haggler v. State, 49 Ala. App. 259, 270 So.2d 690 [(1972)].
 " 'Where the evidence presented raises questions of fact for the jury, and such evidence, if believed, is sufficient to sustain conviction, the denial of a motion to exclude the State's evidence, the refusal to give the affirmative charge and denial of a motion for new trial, do not constitute error. Young v. State, 283 Ala. 676, 220 So.2d 843 [(1969)].' "
Walker v. State, 416 So.2d 1083, 1089 (Ala.Cr.App. 1982). *Page 174 
This court is required to consider the evidence in the light most favorable to the prosecution. Bozeman v. State,401 So.2d 167 (Ala.Cr.App.), cert. denied, 401 So.2d 171 (Ala.), cert. denied, Bozeman v. Alabama, 454 U.S. 1058, 102 S.Ct. 606,70 L.Ed.2d 595 (1981). Furthermore, evidence which is favorable to the prosecution must be taken as true and the State must be accorded all legitimate inferences therefrom. Neal v. State, supra, at 259; Jolly v. State, 395 So.2d 1135 (Ala.Cr.App. 1981). "Once the State presents a prima facie case, 'the resolution of conflicting testimony on the part of the State witnesses is for the jury.' Patterson v. State, 455 So.2d 284,285 (Ala.Cr.App. 1984); Mosley v. State, 461 So.2d 34, 36
(Ala.Cr.App. 1984)." Steele v. State, 512 So.2d 124
(Ala.Cr.App. 1986). This court will not address the credibility of the State's evidence.
 II
The appellant further argues that a lack of credible evidence presented against him should have required that the trial court charge the jury on lesser included offenses. Although the appellant has failed to state, in his brief, which particular lesser included offenses he wished to have charges given on, the record indicates that the defense counsel only objected to the trial court's failure to give a lesser included offense charge on murder. The trial judge in denying the defense counsel's request for a charge on murder, made a lengthy statement concerning the law in Alabama as its relates to charges on lesser included offenses. He concluded that no reasonable theory could be concluded from the evidence to support a lesser included offense. During this explanation, the trial judge stated:
 "In this particular case, the tendency of the evidence shows that the victim in this case, Mr. David Cain, was shot to the rear of the neck and head blowing away the left side of his face, from a blast of a high-powered weapon. The testimony in the case does not lead one to find self-defense or anything of this nature. The Court has reviewed the State's exhibits in this matter which number in the fifties and has heard the testimony, at this particular time, of thirty-two witnesses, I believe. . . . There was testimony that this defendant made a statement pertaining to the robbery of the victim and had made inquiries as to money that the victim might have. There is testimony concerning whether or not the Defendant had items that belonged to the victim and there is numerous other circumstantial evidence matters before the Court. The Court, in application of the statutory and case law of this State, determines that there would not be a rational basis for giving a lesser-included offense instruction in this case. The Defendant's position is that he was not there, had nothing to do with the crime, and that he is completely innocent of any wrongdoing. The State's evidence is that he killed a man during a commission of kidnapping and robbery by shooting him to the back of the head with a high-powered shotgun which caused immediate death, and the Court is unable to find any rational basis for charging on lesser-included offenses. Under the tendency of this evidence, the Defendant is either entitled to a verdict of Not Guilty or the State is entitled to a verdict of Guilty and that's an issue for the jury. Your request for instructions on lesser-included offenses is denied."
The trial judge did not err in refusing to give the jury a charge on the lesser included offense of murder. A trial judge may refuse to charge on a lesser included offense when it is clear to the judicial mind that there is no evidence to support the jury's being charged on the lesser included offense.Greer v. State, 475 So.2d 885, 890 (Ala.Cr.App. 1985); Wesleyv. State, 424 So.2d 648 (Ala.Cr.App. 1982).
 "[W]here the accused denies committing any offense, if any reasonable interpretation of the evidence will justify a verdict finding the accused guilty of a lesser included offense, the jury must be so instructed. Ex parte Stork, 475 So.2d 623 (Ala. 1985). A judge may properly refuse to charge on lesser included offenses only where the only reasonable conclusion from the evidence is that the *Page 175 
accused is guilty of the offense charged or no crime at all or where the requested charge would have a tendency to mislead or confuse the jury."
McKeithen v. State, 480 So.2d 36, 37 (Ala.Cr.App. 1985). See also Williams v. State, 377 So.2d 634 (Ala.Cr.App.), cert. denied, 377 So.2d 639 (Ala. 1979); Lami v. State, 43 Ala. App. 108, 180 So.2d 279 (1965).
"If, however, the defendant denies the charge but the evidence presented by the State suggests a reasonable theory supporting a charge on a lesser offense, the trial court is obliged to give a charge on the lesser offense when requested."Ex parte Pruitt, 457 So.2d 456, 457 (Ala. 1984). It is clear that neither Gurganus's defense of alibi, nor the evidence presented by the prosecution, presented a reasonable theory supporting a charge on a lesser offense. See Daniels v. State, [Ms. 1 Div. 92, Nov. 26, 1985] (Ala.Cr.App. 1985). "Clearly, if the jury believes [the appellant], he must have been found not guilty; if they believed the prosecution's evidence, he must have been found guilty of the crime charged. See Cook v. State,431 So.2d 1322, 1324-25 (Ala. 1983)." Daniels v. State, supra, slip opinion at 23.
 III
The appellant argues that his conviction should be reversed because of the admission of an allegedly illegal fingerprint card. The State introduced the card in proving the identification of the corpse. The appellant argues that the fingerprint card was neither admissible under § 12-21-35, Codeof Alabama (1975), nor under the doctrine of past recollection recorded. The State contends that the fingerprint card was admissible under § 12-21-43, Code of Alabama (1975), and under the doctrine of past recollection recorded.
The record indicates that J.B. Jolly, who was retired from the Alabama Department of Public Safety, where he had been "head of the Identification Bureau in Montgomery," the state repository for fingerprints, testified that in 1951 he was working as Identification Officer at the Jefferson County Sheriff's Office in Birmingham. He identified a fingerprint card that was taken on June 6, 1951, at the Jefferson County Jail in Birmingham. He further testified that the card indicated that he had taken the prints and he further testified that he was the only person during that time period at the Jefferson County Sheriff's Department who was taking prints. He further testified that he obtained the name on the card from the person whose prints appeared on the card and also from a jail commitment slip. The fingerprints allegedly were those of the victim, David Cain. Jolly further testified that Cain's signature appeared at the bottom of the card. Jolly stated that the card was in the same or substantially the same condition as when he rolled the prints back in 1951. The appellant objected at trial on the grounds that the State did not prove a proper chain of custody. Jolly testified on voir dire examination that he left the Sheriff's Department on October 1, 1964, and did not see the card again until he picked it up for trial. Jolly further testified that the card had been changed three times, to indicate different addresses, occupations, and birthdates. He also indicated that he had made the changes. The court questioned the witness, who testified that the cards were filled out in the regular course of business and outlined the procedures taken in classifying the cards. He further stated that all of the notations appearing on the card were made by him and that he could positively identify the card. Jolly stated on cross-examination that he had no independent recollection of those events in 1951.
In Magwood v. State, 494 So.2d 124 (Ala.Cr.App. 1985), affirmed, 494 So.2d 154 (Ala. 1986), cert. denied, Magwood v.Alabama, ___ U.S. ___, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986), the appellant contended that the trial court committed reversible error in allowing a fingerprint card containing the appellant's fingerprints into evidence. This court in addressing the issue stated:
 "It should be noted that the officers who prepared the prints, latent and known, identified them at trial, and testified that they were in substantially the same condition as when they were first *Page 176 
taken. The fingerprint expert identified them as the ones she had used in her comparisons. Evidence of fingerprints is capable of eyewitness identification, and it is a sufficient foundation for the introduction of such evidence that a witness identifies it and it has relevance to the issues of the case. Under these circumstances it is not necessary to establish a complete chain of custody. Richardson v. State, 354 So.2d 1193
(Ala.Cr.App. 1978); Stewart v. State, 347 So.2d 562
(Ala.Cr.App. 1977); People v. Thibudeaux, 98 Ill. App.3d 1105, 54 Ill.Dec. 275, 424 N.E.2d 1178
(1981); Hoskins v. State, 441 N.E.2d 419 (Ind. 1982); Commonwealth v. LaCorte, 373 Mass. 700, 369 N.E.2d 1006 (1977); State v. Beck, [167 W. Va. 830] 286 S.E.2d 234 W. Va. (1981). Chain of custody requirements do not apply with the same force to items of evidence which are unique and identifiable in themselves. State v. Beck. The fingerprint and palm print introduced in evidence in this case squarely fall in the category of evidence unique and independently identifiable."
Magwood v. State, supra, at 144.
The State in the present case also presented testimony by Dr. John McDuffie, who testified that the prints which were taken at the victim's autopsy were made by the same individual whose prints appeared on the fingerprint card taken by Jolly and labeled "David Cain, Jr." Furthermore, the appellant "produced no evidence that the prints were not authentic or had been tampered with." Magwood v. State, supra, at 144. The weight to be given fingerprints is for the determination of the jury in light of the surrounding facts and circumstances. Nichols v.State, 462 So.2d 922 (Ala.Cr.App. 1984), cert. denied,462 So.2d 992 (Ala. 1985).
Moreover, fingerprint records may properly be admitted as business records. Bighames v. State, 440 So.2d 1231, 1235
(Ala.Cr.App. 1983). This court in Bighames, noted that although it did not appear that the prosecution specifically sought to admit the fingerprint cards as business records, "a good argument can be made that the record contains sufficient information to authorize the admission of the fingerprint cards as business records under Section 12-21-43." Id. at 1235. Jolly testified in the case sub judice that he regularly took such prints, explained the system for processing and filing them, and, thus, "[a]ll other circumstances of the making of such writing or record, . . . may be shown to affect its weight, but they shall not affect its admissibility." § 12-21-43 (in pertinent part).
The court in Bighames additionally noted that the fingerprint card was signed by the appellant. " 'The general rule is well settled that identity of name imports, prima facie, identity of person.' Esco v. State, 278 Ala. 641, 643, 179 So.2d 766
(1965)." Id. at 1235. This court in Bighames also noted:
 "The general rule is that the identification expert must have personal knowledge of the person whose fingerprints are on the fingerprint card before that witness can testify that the card bears the fingerprints of a specific individual. People v. Zirbes, 6 Cal.2d 425, 57 P.2d 1319, 1322
(1936). Otherwise, the expert's testimony constitutes hearsay and the admission of the fingerprint card is improper."
Bighames v. State, supra, at 1235.
However, in the present case Jolly properly testified concerning the fingerprint cards under the doctrine of past recollection recorded, an exception to the hearsay rule. Under the doctrine of past recollection recorded,
 "[T]he witness, after examining the memorandum, cannot testify to an existing knowledge of the fact, independent of the memorandum. This use of the memorandum is often referred to as Past Recollection Recorded; and if the witness testifies that, at or about the time the memorandum was made, he knew its contents and knew them to be true, then both his testimony and the memorandum become admissible. The memorandum and the witness' testimony are the equivalent of a present positive statement of *Page 177 
the witness affirming the truth of the contents of the memorandum."
C. Gamble, McElroy's Alabama Evidence, § 116.01 (3d ed. 1977).
 "The predicate for the admission of a document representing a witness' past recollection recorded is stated in C. Gamble, McElroy's Alabama Evidence
§ 116.03 (3rd ed. 1977).
 " 'A writing exhibited to a witness while he is on the witness stand and which proports to be a statement of a past event is admissible as evidence of the truth of the matter stated if the witness testifies that he now knows, or testifies to facts showing that he now knows, the following:
 " '(1) That he personally observed the event or facts referred to in the writing and that the writing was made or seen by the witness either contemporaneously with the event or when his recollection of the event was fairly fresh.
 " 'It is not essential, to benefit from past recollection recorded, that the witness himself shall have made the writing. The writing may have been made by another person if the witness saw it when the event recorded was fairly fresh in his memory and he then knew the statements in the writing to be correct.
 " '(2) That he knew the contents of the writing and knew such contents to be true and correct.
 " 'Where the witness testifies that the writing is in his own handwriting, he may testify further that he knows from his general practice in making writings of that kind that what he wrote was true.
 "(3) That he has no present recollection of the event other than his testimony to the matters stated in 1 and 2 above.' "
Higdon v. State, 367 So.2d 991, 994 (Ala.Cr.App. 1979).
Jolly testified that he personally took the fingerprints and signed the card. He further testified that he was the only person at the time to take fingerprints and that, from his general practice, he knew that the name on the card came from the individual's own admission and jail commitment card. He also stated that he had no independent recollection of the events other than the information on the card.
"Although it is recognized that fingerprint . . . evidence is circumstantial or opinion in nature, the basic reason for the universal recognition of its admissibility to establish identify is its great reliability." Nichols v. State,462 So.2d 992, 994 (Ala.Cr.App. 1984).
 IV
Appellant argues that his conviction should be reversed because of the trial court's refusal to allow into evidence statements made by the appellant regarding his intent to travel. During the cross-examination of Bobby Joe McGraw, the following transpired:
 "[DEFENSE COUNSEL]: Now, Bobby, when you went to the fish fry, I asked you if it's not true that you talked to Dennis Gurganus and at that time he told you that he had had to go to Texas because his wife's car had broken down?
 "[PROSECUTOR]: Your Honor, I object. It calls for hearsay.
 "THE COURT: You went into the statement, as I understand, of the defendant, did you not?
"[DEFENSE COUNSEL]: Yes, sir.
"THE COURT: Okay.
 "[PROSECUTOR]: He's asking for a statement of the defendant which is not a part of the res gestae and is not being offered by the State and we would object.
 "THE COURT: Are you alleging that this was part of the same conversations and activities?
 "[DEFENSE COUNSEL]: The conversation the Defendant had with this man and its relevance to a point that will be raised by the State.
 "THE COURT: The same conversation that he went into or some other time and place? *Page 178 
 "[DEFENSE COUNSEL]: With regard to the Defendant going to Texas.
 "THE COURT: Well, don't worry about what the subject matter is. I'm asking you is this conversation the same conversation that they went into?
"[DEFENSE COUNSEL]: Not just then, no, sir.
"[PROSECUTOR]: We would object, Your Honor.
"THE COURT: This is a different time and place?
"[DEFENSE COUNSEL]: Yes, sir.
"THE COURT: Sustained at this point.
"[DEFENSE COUNSEL]: We except." (Emphasis added.)
The appellant argues that his previously stated intention to travel to Texas should have been admitted in order to dispute the inference of guilt which the law allows to be inferred from flight. However, as emphasized in the portion of the record quoted above, the defense counsel sought to admit this evidence to refute what he referred to as "a point that will be raised by the State" and was not yet in evidence. Furthermore, the trial court sustained the objection only as it related to the evidence introduced "at this point." Evidence of flight by the accused is admissible to show his consciousness of guilt and may be considered by the jury in determining guilt. Prock v.State, 471 So.2d 519 (Ala.Cr.App. 1985); Carlisle v. State,465 So.2d 1205 (Ala.Cr.App. 1984); Bighames v. State,440 So.2d 1231 (Ala.Cr.App. 1983). Where the State introduces evidence tending to prove flight, the door is opened for the appellant to prove that his departure from the scene of the crime was motivated by factors other than consciousness of guilt.Mitchell v. State, 53 Ala. App. 625, 303 So.2d 123, 124, cert. denied, 293 Ala. 767, 303 So.2d 126 (1974). "However, where the State does not seek to show flight on the part of the defendant, it is incompetent for the defense to show that the accused voluntarily surrendered or failed to flee when the opportunity was offered." Rowser v. State, 346 So.2d 533, 535
(Ala.Cr.App.), cert. denied, 346 So.2d 536 (Ala. 1977).
Even if it was error to disallow Bobby Joe McGraw to testify concerning the appellant's intentions to travel to Texas, the error was harmless. Both the appellant's wife and the appellant testified that he traveled to Texas in order to repair his wife's car. Therefore, the testimony by McGraw would have been cumulative. "The trial court here allowed the appellant considerable latitude to explain his whereabouts during the time interval involved, and we are not persuaded that reversible error is shown here." Holt v. State, 343 So.2d 582,586 (Ala.Cr.App. 1977).
 V
The appellant argues that his conviction should be reversed because of allegedly illegal comments made by the trial judge. The record indicates that following the jury voir dire, the trial judge stated:
 "Ladies and gentlemen, at this time the attorneys have to select their jury, and, of course, I'm going to have to give you some instructions pertaining to this case. You cannot discuss this case among yourselves or with any one else or allow any one to discuss the case with you, within your presence, or within your hearing.
 "It'll take the attorneys a little while to select a jury and from time to time I'm asked, well, what takes so long? And every time I hear that I'm reminded of the fact that recently in Atlanta, Georgia they selected a jury in three weeks. It is going to take us a little while, maybe a half an hour to an hour to select a jury, maybe a few minutes longer. It's not a long time when its compared to what goes on in your sister states, but it takes the attorneys a while to get their jury selected for this case."
The appellant contends that the trial court's reference was to the Wayne Williams's murder trial in Atlanta and was a highly prejudicial reference.
The appellant made no objections to the above remarks. "Unless allegedly prejudicial remarks by trial court are objected to, the remarks are not subject to review except where they are grossly improper. *Page 179 
There must be either an objection, a motion to exclude, or a motion for the jury to disregard the statement before error will be preserved." Lokos v. State, 434 So.2d 818, 823
(Ala.Cr.App. 1982), aff'd, 434 So.2d 831 (Ala. 1983). The appellant failed to adequately preserve this issue for review. In addition, the trial court's statement was not a clear reference to the Wayne Williams trial nor an indication that the Williams trial was similar to the case at hand. The trial court was merely commenting on the amount of time that attorneys spend in striking a jury. There is no indication that the appellant was prejudiced in any way by this remark.
AFFIRMED.
All the Judges concur.