[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 681 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 682 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 683 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 684 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 685 
Rickey Lee Johnson was indicted for capital murder, in violation of § 13A-5-40(a)(2), Code of Alabama 1975. He was found guilty as charged in the indictment and was sentenced to death.
The State's first witness during the guilt-phase of the trial was Ricky Lewis. He testified that he knew Ruby Brown and Emma Whitehead and that he was familiar with the neighborhood in which they lived. He testified that their house was next to a vacant house where he and some other men went to visit with each other and to drink. He went to the vacant house during the daytime on June 8, 1988. He testified that he was later joined by his uncle, Alvin Lewis. He further testified that he fell asleep. He woke up when he heard "popping" noises that sounded like something was burning. (R. 212.) He looked out the window, but did not see anything. He looked again when he heard someone close the door at Brown's house. He saw that the house was on fire and saw a man with his hair styled in a "jheri curl" walk off Brown's porch. The man walked toward a nearby transmission shop. Lewis testified that he ran over to the house. He and his uncle were unable to get into the house because of the fire.
The record reveals that Ruby Brown lived in Birmingham with her 70-year-old cousin, Emma Whitehead. Brown testified that on June 8, 1988, she left their home at 6:30 a.m. to go to work. She arrived home from work at approximately 3:45 p.m. She testified that the door was cracked. When she walked into the house she saw a man, later identified as the appellant, standing behind the door holding an electric clothes *Page 686 
iron. After she entered, he shut the door and hit her in the face with the iron. She testified that she then lost her balance and fell. He hit her again after she got up. She looked at his face and asked him what he wanted. He said he that he wanted money. He then hit her with a crystal candy dish. Brown identified the appellant as the man who had hit her. She testified that she saw his face when she came in the door and that she also saw his face before he hit her with the candy dish.
Brown testified that the appellant left the room she was in and went to a back room in the house. She ran out of the house. The appellant chased her. He grabbed her hair and dragged her back into the house. He locked the door and hit her on the head with a lamp. The appellant then knocked her to the floor and would not let her get up. He said that he wanted money. Brown watched the appellant as he looked through her purse. The appellant took approximately $78 from her purse. Brown testified that as the appellant was going through her purse, he threatened to kill her. He also demanded to know where her housemate (Emma Whitehead) kept her money. Brown testified that she asked the appellant about her cousin and called out her name three or four times. Whitehead did not respond. The appellant told her to save her energy because her cousin was going to need her.
Brown testified that she pretended to lose consciousness and that the appellant then went to a back room. She realized that the appellant had set the house on fire. She escaped out the front door and sought assistance at a local business.
Brown further testified that she observed the appellant's face in well-lighted conditions several times during the ordeal. She stated that she was able to see his face when he was holding the iron and again before he hit her with the candy dish. She also saw his face when he dragged her back into the house after her initial attempt to escape. She also saw his face when he hit her with the lamp. She testified that Whitehead was alive when Brown left for work that morning. She further testified that she had met the appellant at his aunt's house sometime prior to the murder.
On cross-examination, Brown testified that she met the appellant at his aunt's house sometime in 1988 after his uncle's death. She stated that at that time, his face was clean-shaven and his hair was styled in a jheri curl. She further testified that on the day of the murder, the appellant's hair was styled in a jheri curl. She denied telling Sergeant Randy Boissel that the appellant's hair was not styled in a jheri curl or was in an afro. She identified defendant's Exhibit No. 1 as the police artist's composite drawing of the assailant and stated that the drawing showed the appellant's hair in a jheri curl.
Ronnie Howard testified that he was employed by Tranco Transmission, a business located approximately one-half block from Brown's house. He testified that he was working on June 8, 1988. He saw Ruby Brown coming home from work at approximately 3:00 p.m. He testified that he saw her again later that afternoon, after she had been attacked. He testified that Brown told him that "he" had tried to kill her and that Whitehead was still in the house. (R. 312.) He testified that Brown's house was on fire.
Charles Smith, who was working at Jordan Scrap on June 8, testified that he knew Ruby Brown because her house was located behind the scrap yard. He was getting ready to close when he saw that Brown's house was on fire. He testified that he ran to the house and opened the front storm door. He closed the door when fire and smoke came out of the house. The back door was locked. He testified that the fire occurred on a Wednesday. He further testified that the appellant came to the scrap yard on the following Friday and asked Smith if he knew him or had ever seen him. Smith answered in the negative. The appellant then asked to see Mr. Jordan and asked Jordan if he knew him. When Jordan said that he had never seen the appellant before, the appellant showed Jordan his driver's license.
On cross-examination, Smith testified that earlier in the afternoon on June 8, *Page 687 
Alvin Lewis, a man named Chip, and another black male came to the front gate and asked about a job. He testified that he did not think the appellant was the third man.
Charles McPhate, a patrol officer with the Birmingham Police Department, testified that he responded to the call regarding the fire at Ruby Brown's house. He received the call at approximately 4:45 p.m. He rendered aid to Brown and secured the scene. He then turned the scene over to Officer Fred Hedgepeth, an evidence technician. He testified that he spoke to several people at the scene. He testified that the appellant's cousin, Linda Watkins, indicated that the appellant might be the perpetrator.
Officer Hedgepeth, testified that he arrived at the scene at approximately 5:20 p.m. and that the scene had been secured. He went through the back door and saw Emma Whitehead's body on the kitchen floor. Hedgepeth collected numerous items of evidence from the scene, including the rear storm door handle, the door threshold, stain samples he believed to be blood, a hammer, and fingerprints.
Jefferson County Coroner Dr. Robert Brissie performed an autopsy on Emma Whitehead. He testified that the deceased had inhaled an appreciable amount of dense smoke. He testified that she had died as a result of extensive blunt force trauma with smoke inhalation secondary to a beating. (R. 434.) He testified that had she suffered at least 16 blows to the head area and at least seven blows to other parts of the body. He testified that most of her scalp was bruised and that there were several depressed skull fractures. He testified that the head wounds had bled extensively.
A Birmingham fire inspector, O.J. Hill, testified that he had examined the scene to determine the cause of the fire. He discovered that a fire had been set in the front bedroom and that another fire had been set in the middle bedroom. He further testified that he had eliminated any accidental cause for the fire. He also testified that he could not find any reason to believe that the fires had been caused by electrical problems. He further testified that the fires had not been caused by the heating or air conditioning systems or by any appliances. He also eliminated natural gas or an act of God as the cause of the fires. He testified that he had found debris burning under the bed in the front bedroom.
Debra Carter testified that the appellant came to her apartment on the evening of June 8. He asked whether her husband was home, drank a glass of water, and left. She testified that he was wearing a white tee shirt and jogging pants. His hair was styled in a jheri curl. She testified that he seemed nervous. She further testified that he appeared to have blood on his fingers.
The appellant's cousin, Linda Watkins, testified that the appellant came to her apartment at dusk on June 8. She talked to him in the parking lot. He was wearing sweatpants and a red tee shirt. She testified that the appellant became upset and ran off after she told him that the police were looking for him. She further testified that she saw the appellant at her apartment several times over the next few days. She stated that he had his hair styled in a jheri curl.
Greg Bearden, a Birmingham Police Department evidence technician, testified that he and Officer Jimmy Brown went to the scene on June 9. He collected a hammer in the front yard, a storm door, and the rear storm door. All of the evidence was transported to the Department of Forensic Sciences.
Birmingham Police Officer Steve Cain testified that on June 12, 1988, he saw a man later identified as the appellant. The appellant was walking near the railroad tracks on 43rd Street. Cain testified that he noted that the appellant matched a photograph and a description given by his family. He stopped the appellant and asked him his name. The appellant offered no identification and told Cain that his name was "Bobby." The appellant was then taken to the police station.
Sergeant Randy Boissel testified that he was the police officer responsible for investigating the case. He testified that he returned to the scene at approximately 5:30 *Page 688 
a.m. on June 9, and that he retrieved a tan purse and a black purse. The black purse contained several papers.
Boissel testified that Brown was unable to identify anyone in a June 16 photographic array or in a line-up on July 7. He testified that on July 7, however, Brown reached for a photograph of the appellant among a group of photographs that Boissel had compiled during his investigation. She then identified the appellant as the perpetrator. On cross-examination, Boissel testified that Brown had initially told him that the perpetrator wore his hair in an afro and did not have it styled in a jheri curl.
Larry Huys, a serologist with the Alabama Department of Forensic Sciences, testified that he had examined numerous items of evidence to determine whether they contained components of human blood and if so, the blood type. He determined that the deceased had type O blood and that the blood found on the rear door was type O blood. Several other samples were found to contain human blood, but Huys testified that he was unable to determine the blood type.
Gerald Wayne Burrow, a criminalist in the trace evidence division of the Department of Forensic Sciences, testified that he had examined the fire debris collected at the scene and that he determined that it did not contain any accelerants.
Larry Lollis testified that the appellant came to his apartment between 11:00 p.m. and 11:30 p.m. on June 8. The appellant asked if he could spend the night there because the police were looking for him. He told Lollis that the police believed that he was involved in an arson, but he denied any knowledge of the incident. The appellant spent the night there and left with Lollis the next morning.
Warren Stewart, a fingerprint examiner with the Department of Forensic Sciences, testified that he had received the following items of evidence gathered during the investigation of this case: a Southtrust deposit slip issued to Ruby Brown and a bank deposit receipt dated June 22, 1988. These items had been in the black purse found on the scene. He testified that because he did not immediately turn up any fingerprints, he transferred the items to Boissel. A copy of the appellant's fingerprints were admitted during the testimony of John Glenn, who fingerprinted persons upon admission to the Birmingham City Jail.
Anthony Wiley testified that he saw the appellant in mid-June. They were at the home of Wiley's brother, Eric Lee Hubbard. Several other people were there. The appellant told them that someone had just tried to rob him and he then offered to buy everyone pizza. One of the people there told the appellant that the police were looking for him. Approximately 30 minutes later, the appellant dove out of the apartment through the kitchen window.
Joyce Schultz, a fingerprint examiner with the Birmingham Police Department, testified that she had examined the two documents found in the black purse and had determined that the appellant's fingerprints were on both documents. She testified that the appellant touched each of the documents with his left index finger. The State rested after presenting the foregoing evidence. The appellant's motion for judgment of acquittal was denied.
Rodney Samuels testified for the appellant. He stated that he saw the appellant around noon on the day of the murder. The appellant was wearing shorts and had his hair styled in a jheri curl. He saw the appellant again between approximately 2:00 p.m. and 3:30 p.m. He was with the appellant at that time for approximately 45 minutes. On cross-examination, Samuels testified that he saw the appellant at 1:00 p.m. and then saw him again an hour later.
Herron Calhoun testified that the appellant arrived at his house between 12:00 p.m. and 1:00 p.m. on the day of the murder. They were together until 3:05 p.m., when they walked across the street to see Cedric Drake. They were at Drake's house for one and one-half hours. He testified that he saw fire trucks and the rescue squad arrive at Brown's house. He further testified that the appellant was with him all afternoon. On cross-examination, he testified that Rodney Samuels was also *Page 689 
in Calhoun's apartment and that they all walked to Drake's house at 3:05 p.m.
Rosemary Snow testified that she spoke with Ruby Brown in the emergency room after the murder. She testified that Brown told her that the assailant was a small-framed black man with a lot of hair. She further testified that approximately five days later, Brown gave her the same description. On cross-examination, Snow testified that Brown told her that the perpetrator was a relative of Elizabeth Watkins. The witness acknowledged that the appellant was Watkins's nephew.
Bernard Mayes of the Jefferson County Sheriff's Department testified that he conducted the July 7 live line-up. He testified that Ruby Brown stated that "none of these are the one" at the line-up. (R. 947.)
Julius King testified that he used to live near Ruby Brown. He stated that on the day of the murder, he walked from his house to a restaurant. He stated that on the way to the restaurant he saw Brown's car parked in front of her house. Three men were sitting on the porch of the vacant house next to Brown's house. He testified that the appellant was not one of the three men. He testified that Brown's house was on fire when he returned a short time later.
Samuel Crawford testified that Anthony Wiley had told him that he would "burn Rickey" to get help in his own case and that he would lie if it was necessary. (R. 979-980.) On cross-examination, Crawford testified that he was convicted of first degree robbery the week before this trial and that he had spoken with the appellant when they were incarcerated.
Rickey Lee Johnson testified on his own behalf. He testified that he left his house at 9:00 a.m. on June 8. He and Rodney Samuels went to Junior Calhoun's house. Calhoun was not at home. He and Samuels passed the time until Calhoun arrived home at approximately 12:30 p.m. They stayed at Calhoun's apartment for two or three hours. He testified that they then walked across the street to Cedric Drake's apartment. They remained there for approximately one and one-half hours. They saw the emergency vehicle arrive at the scene of the fire while they were in Drake's backyard.
On cross-examination, the appellant testified that he wore his hair in a jheri curl in June 1988. He stated that on the day of the murder he was wearing a red tee shirt and blue sweatpants. He further testified that after observing the fire trucks, he went back to Calhoun's house and stayed until 7:30 p.m. or 8:00 p.m. He then went to his cousin's house. He testified that he ran away because he thought he saw a police car. He admitted that he was running from the police. He testified that he went to Debra Carter's house and then spent the night at Larry Lollis's apartment. He testified that he ran back to Lollis's apartment the next morning after he thought he saw a police car. He broke a window and crawled inside.
The appellant testified that he was at Eric Lee Hubbard's house two days after the murder. Several other people were there. He testified that he jumped out of the apartment window because he was afraid that the others were going to rob him because he was carrying a substantial amount of money. He testified that he was stopped by the police after leaving the apartment. He testified that he told the police that his name was Bobby.
The appellant raises 19 issues on appeal. We note that many of the arguments raised on appeal were not raised at the trial court level.
 "[S]ince this is a death case, we must review the [alleged] error before us to see if it constitutes plain error and, thus, should be noticed despite the lack of proper objection by defense counsel. Rule 45A, A.R.A.P. In considering what constitutes 'plain error' in a capital case, the Alabama Supreme Court has looked to the federal court's interpretation of what is 'plain error.' See Ex parte Harrell, 470 So.2d 1309
(Ala. 1985); Ex parte Womack, 435 So.2d 766
(Ala. 1983) [cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983)].
 "In United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the *Page 690 
Supreme Court stated that the plain error doctrine should be used to correct only 'particularly egregious errors' . . . which are those errors that 'seriously affect the fairness, integrity or public reputation of judicial proceedings'. . . . The plain error rule should be applied 'solely in those circumstances in which a miscarriage of justice would otherwise result.' Young, supra, 105 S.Ct., at 1047. . . .
 "Furthermore, the court noted that the plain error doctrine requires that the 'claimed error not only seriously affects "substantial rights" [of the defendant], but that it had an unfair prejudicial impact on the jury's deliberations. Only then would [a] court be able to conclude that the error undermined the fairness of the trial and contributed to a miscarriage of justice.' Young, supra, 105 S.Ct., at 1047, n. 14."
Hooks v. State, 534 So.2d 329, 351-52 (Ala.Crim.App. 1987),aff'd, 534 So.2d 371 (Ala. 1988), cert. denied, 488 U.S. 1050,109 S.Ct. 883, 102 L.Ed.2d 1005 (1989). See also Kuenzel v.State, 577 So.2d 474 (Ala.Crim.App. 1990), aff'd,577 So.2d 531 (Ala.), cert. denied, ___ U.S. ___, 112 S.Ct. 242,116 L.Ed.2d 197 (Ala. 1991). Our examination of the record reveals no plain error.
 I
The appellant first contends that his conviction must be reversed because Ruby Brown's identification of the appellant was tainted and unreliable. He argues that the identification procedures used by the police were unnecessarily suggestive and, thus, Brown's identification was unreliable. We disagree.
The record reveals that the appellant moved to suppress Brown's pretrial identification and any identification that she might make at trial. The record reveals that a photograph of the appellant was included in a photographic array held on June 16, 1988, and a line-up held on July 7, 1988. Brown was unable to identify her assailant on either occasion. Immediately after the line-up, Brown went to Sergeant Boissel's office. At the suppression hearing, Boissel testified that he was going to show Brown some pictures of the people who would frequently drink at the vacant house. He testified that he was stacking the pictures in front of him when Brown reached over to one of the pictures and identified her assailant. She identified a photograph of the appellant. Brown testified that she went to Boissel's office so that he could show her some photographs. She stated that the photograph of the appellant fell out of a book. She testified that she made her identification based on what she had witnessed at her home. She stated that Boissel did not tell her whom to identify.
When a party challenges a pretrial identification, this court must perform a two-part analysis. "First, we must determine if the identification procedure was unnecessarily suggestive. If we find that the line-up was unnecessarily suggestive, then we must review the 'totality of the circumstances' (five factors) as set out in Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375,34 L.Ed.2d 401 (1972)." Young v. State, 563 So.2d 44, 46
(Ala.Crim.App. 1990) (citations omitted). See also James v. State,549 So.2d 562 (Ala.Crim.App. 1989); Johnson v. State,453 So.2d 1323 (Ala.Crim.App. 1984).
There is absolutely no evidence in the record that indicates any suggestiveness in the identification procedures. Although the appellant was the only individual common to the photographic array and the line-up, this fact alone cannot, "without further indicia of suggestiveness, render the lineup conducive to irreparable misidentification." United States v.Davenport, 753 F.2d 1460, 1463 (9th Cir. 1985). See also Vinstonv. Lockhart, 850 F.2d 420 (8th Cir. 1988). Because we find no evidence of suggestiveness, this court is not required underNeil v. Biggers to examine the totality of the circumstances to determine whether there was a substantial likelihood of misidentification. Even if the pretrial identification had been tainted, however, the record indicates that Brown had sufficient independent opportunity to form the basis for her in-court identification. *Page 691 
See James. We note that the appellant's contention that there was no independent basis for Brown's in-court identification is based in large part on what he considers to be discrepancies in her identification testimony. He also argues that the appellant looks nothing like the police sketch that was drawn from Brown's description. "The quality of a victim's description of the perpetrator goes to the weight and the credibility of the victim's identification rather than its admissibility."Nickerson v. State, 539 So.2d 337, 340 (Ala.Crim.App. 1987). See also Johnson. "It is common knowledge, of which we take notice, that human beings can recognize and identify other human beings with considerable accuracy, even though they cannot give a clinical definition of their height, weight, age, dress, or combination of facial features." Clency v. State,475 So.2d 642, 644 (Ala.Crim.App. 1985). The trial court did not err in admitting both Brown's pre-trial and in-court identification of the appellant.
The appellant raises three issues in footnotes to his numbered argument and we will discuss these here. The appellant's argument that the trial court erred in failing to demonstrate on the record that it considered the Neil v.Biggers factors has no merit. The trial court was not required to consider the factors because the pre-trial identification procedures were not impermissibly suggestive. His claim that his arrest was illegal also has no merit. The appellant was properly arrested without a warrant because the police had reasonable cause to believe that he had committed a capital murder. Ex parte Hamm, 564 So.2d 469 (Ala. 1990), cert. denied,498 U.S. 1008, 111 S.Ct. 572, 112 L.Ed.2d 579 (1990). The appellant's claim that counsel should have been present during the photographic array and the line-up also has no merit. SeeLundy v. State, 484 So.2d 1132 (Ala.Crim.App. 1985).
 II
The appellant next contends that pervasive hearsay testimony disclosing that he was a suspect in the crime was improperly admitted at trial. He particularly points to the testimony of Charles McPhate, Linda Watkins, Sergeant Randy Boissel, and the appellant himself. This argument has no merit. We have carefully reviewed the specific allegations of hearsay cited by the appellant. The record reveals that none of the testimony challenged by the appellant constituted hearsay.
Officer McPhate testified that he was given information at the scene of the crime and was told to look for the suspect. McPhate also testified that he spoke with Linda Watkins and that she told him who the perpetrator might be. Linda Watkins testified that she had a few words with McPhate at the crime scene and that her sister looked at a note pad that McPhate was holding. The appellant's name was written on the note pad along with several other names. Boissel testified that he had omitted another individual named "Dooley" as a suspect because Boissel had verified his alibi. The appellant contends that a persistent theme of the State's cross-examination of the appellant was a "street rumor" that the appellant was a suspect.
"Hearsay testimony consists of an out-of-court statement offered to prove the truth of the matter asserted. However, the prohibition against hearsay testimony applies only to a statement offered to prove the truth of its contents. 'A statement offered for some other purpose other than to prove the truth of its factual assertion is not hearsay.' "Brannon v. State, 549 So.2d 532, 539 (Ala.Crim.App. 1989) (citations omitted). See also McCray v. State, 548 So.2d 573
(Ala.Crim.App. 1988); Molina v. State, 533 So.2d 701
(Ala.Crim.App. 1988), cert. denied, 489 U.S. 1086, 109 S.Ct. 1547,103 L.Ed.2d 851 (1989).
The appellant strenuously argues that much of the challenged testimony led to an "inference" of hearsay. This argument has no merit. A prohibition against an inference of hearsay would be too vague for any court to enforce. This court would be going too far afield to expand the prohibition against hearsay to inferences of hearsay. The record reveals that the challenged testimony did not constitute hearsay. There was no statement offered *Page 692 
into evidence that a third person had named the appellant as the perpetrator. Furthermore, even if the witnesses had testified as to various out-of-court statements, the testimony would still have been admissible because it did not constitute hearsay. In each instance cited by the appellant, the testimony was not offered to prove the truth of the matter asserted, but rather, was offered to explain actions taken in response to information received. Thus, the testimony did not constitute hearsay. See, e.g., Baker v. State, 555 So.2d 273
(Ala.Crim.App. 1989); Thomas v. State, 520 So.2d 223
(Ala.Crim.App. 1987).
The appellant argues briefly in a footnote that his statement was involuntary. This argument has no merit. Sergeant Boissel's testimony established that the statement was voluntarily made and that the requirements of Miranda v. Arizona, 384 U.S. 436,86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), were satisfied.
We also note that the appellant failed to object to any of the challenged testimony on the grounds of hearsay. Although this court is required to review the record for plain error in capital murder cases, the plain error doctrine is applied only to correct errors that are particularly egregious and would seriously affect the fairness and integrity of the judicial proceedings. Kuenzel. Even if error occurred in allowing the testimony, it certainly did not rise to the level of plain error.
 III
The appellant next contends that the trial court erred in admitting several photographs of the deceased during both the guilt and penalty stages of the trial because they were grossly inflammatory. We have reviewed the challenged photographs and, although they are not pleasant to look at, we conclude that the trial court did not err in admitting them at either stage of the proceedings.
"[P]hotographs that show the external wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters." Ex parteSiebert, 555 So.2d 780, 783 (Ala. 1989), cert. denied,497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990). See also Ex parteBankhead, 585 So.2d 112 (Ala. 1991). "[P]hotographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors." Ex parte Siebert at 784. See also Exparte Bankhead. We find no error in the trial court's admission of the photographs at the guilt phase of the trial. See, e.g.,Smith v. State, 581 So.2d 497 (Ala.Crim.App. 1990), rev'd onother grounds, 581 So.2d 531 (Ala. 1991) (photographs of victim's decomposed and bloated body properly admitted); Dabbsv. State, 518 So.2d 825 (Ala.Crim.App. 1987) (photographs of victim's head injuries taken during autopsy were gruesome but necessary to demonstrate extent of injuries); Hamilton v.State, 492 So.2d 331 (Ala.Crim.App. 1986) (photograph of deceased's exposed scalp properly admitted into evidence). The photographs were also properly admitted at the sentencing stage of the trial to prove that the robbery-murder was especially heinous, atrocious or cruel. Ex parte Bankhead.
 IV
The appellant next contends that the trial court improperly admitted evidence that his fingerprints were found on articles located at the crime scene. He raises three separate arguments concerning this evidence. These arguments will be addressed separately below.
 A
The appellant first contends that the trial court erred in admitting the fingerprint evidence because, he argues, the State failed to prove a proper chain of custody with regard to the latent prints that were found on the documents contained in the black purse found at the crime scene. He asserts that there were numerous breaks in the chain, including the time between the initial investigation of the crime scene and the recovery of the black purse at 5:30 a.m. on the morning following the crime. *Page 693 
 "The purpose for requiring that the chain of custody be shown is to establish to a reasonable probability that there has been no tampering with the evidence. 'The evidence need not negate the most remote possibility of substitution, alteration, or tampering with the evidence, but rather must prove to a reasonable probability that the item is the same as, and not substantially different from, the object as it existed at the beginning of chain.' "
Ex parte Williams, 505 So.2d 1254, 1255 (Ala. 1987) (quoting this court in Williams v. State, 375 So.2d 1257, 1266
(Ala.Cr.App. 1979)). Although a sufficient chain of custody must be proved before the admission of certain types of evidence, this court has held that fingerprint evidence is capable of eyewitness identification and "it is a sufficient foundation for the introduction of such evidence that a witness identifies it and it has relevance to the issues of the case." Magwood v.State, 494 So.2d 124, 144 (Ala.Crim.App. 1985), aff'd,494 So.2d 154 (Ala. 1986), cert. denied, 479 U.S. 995,107 S.Ct. 599, 93 L.Ed.2d 599 (1986). See also Watkins v. State,565 So.2d 1227 (Ala.Crim.App. 1990). "Chain of custody requirements do not apply with the same force to items of evidence which are unique and identifiable in themselves. . . . [Fingerprint evidence] squarely fall[s] into the category of evidence unique and independently identifiable." Magwood at 144. Although proof of a complete chain of custody is not required, the State did establish a complete, unbroken chain of custody with regard to the fingerprint evidence. Nothing in the record suggests that the black purse or the items found in the purse were altered, tampered with, or substituted. The appellant's averment of tampering is based on speculation; there is absolutely no evidence to support it. We also note that the appellant offered no explanation or theory as to how his fingerprints got on the documents. He consistently stated that he was never in the house where the murder occurred. There was no error in the admission of the fingerprints based on the ground of an insufficient chain of custody. See, e.g., Magwood.
 B
The appellant next contends that the fingerprint evidence was improperly admitted because, he argues, the witnesses who testified about the fingerprint evidence were not qualified and the State failed to prove that the ninhydrin technique used to reveal latent fingerprints was reliable. This argument has no merit.
A determination of whether a witness will be allowed to testify as an expert rests within the discretion of the trial court. Robinson v. State, 574 So.2d 910 (Ala.Crim.App. 1990);Gullatt v. State, 409 So.2d 466 (Ala.Crim.App. 1981). "An individual may qualify as an expert by study, practice or observation. An expert is one who can enlighten a jury more than the average man in the street." Gullatt at 472 (citations omitted).
The record reveals that Warren Stewart, who performed the ninhydrin tests on the documents, had extensive experience, was qualified and was a certified evidence technician. The record also reveals that Joyce Schultz, the individual who compared the latent prints with the appellant's prints, was also qualified to testify as an expert. We note that Schultz has previously testified as an expert in this field. Watts v.State, 491 So.2d 1057 (Ala.Crim.App. 1986); Bighames v. State,440 So.2d 1231 (Ala.Crim.App. 1983). In a footnote, the appellant also argues that John Glenn, the individual who took the appellant's fingerprints at the city jail, was not properly qualified as an expert. This argument likewise has no merit.
Johnson's challenge to the ninhydrin process also has no merit. The ninhydrin process has been generally accepted for over a decade as indicated by cases in which the development of latent fingerprints through this process was discussed and the admission of these fingerprints were admitted into evidence without question. See United States v. Baker, 650 F.2d 936 (8th Cir. 1981); United States v. Arce, 633 F.2d 689 (5th Cir. 1980),cert. denied, Coronado v. U.S., 451 U.S. 972, 101 S.Ct. 2051,68 L.Ed.2d 351 (1981); United States *Page 694 v. Berry, 599 F.2d 267 (8th Cir. 1979), cert. denied,444 U.S. 862, 100 S.Ct. 129, 62 L.Ed.2d 84 (1979); United States v.Gocke, 507 F.2d 820 (8th Cir. 1974), cert. denied, 420 U.S. 979,95 S.Ct. 1407, 43 L.Ed.2d 660 (1975); Commonwealth v. Phoenix,409 Mass. 408, 567 N.E.2d 193 (1991); People v. Eyler,133 Ill.2d 173, 139 Ill.Dec. 756, 549 N.E.2d 268 (1989), cert.denied, 498 U.S. 881, 111 S.Ct. 215, 112 L.Ed.2d 174 (1990);People v. Johnson, 47 Cal.3d 1194, 255 Cal.Rptr. 569,767 P.2d 1047 (1989), cert. denied, Johnson v. California,494 U.S. 1038, 110 S.Ct. 1501, 108 L.Ed.2d 636 (1990); Gordon v. State,145 Ga. App. 820, 244 S.E.2d 914 (1978). Furthermore, inRobinson v. State, 574 So.2d 910 (Ala.Crim.App. 1990), this court stated that expert testimony regarding certain established scientific evidence may be received into evidence without further reference to the test set out in Frye v.United States, 293 F. 1013 (D.C. Cir. 1923), either through judicial notice of the general acceptance of the procedure or through a determination that the Frye test does not apply because the evidence's reliability has been established. We find no error in the admission of the fingerprint evidence obtained through the use of the ninhydrin process.
We note that the appellant failed to raise any of these issues at trial. Although this failure does not preclude our review, any error must rise to the level of plain error. Even if any error had occurred, it did not rise to the level of plain error. See, e.g., Kuenzel.
 C
The appellant next contends that the trial court erred in allowing Joyce Schultz to testify about the opinions of other experts regarding the fingerprint evidence because, he argues, such testimony constituted hearsay. Thus, he argues, he was denied his right to confront the witnesses against him. He also contends that error occurred when Joyce Schultz was allowed to testify that John Vaughn, an employee of the Jasper Police Department, also made a comparison between the latent prints and the appellant's prints. He argues that such testimony allowed the jury to infer that Vaughn reached an inculpatory conclusion.
The record reveals that Joyce Schultz testified that two other technicians in her office had examined the fingerprints and that she verified their work. She also testified that John Vaughn had looked at the fingerprints. Schultz did not, however, testify as to the opinions of any of these individuals. She did not testify that these individuals also determined that the latent prints matched the appellant's fingerprints. She simply stated that she reviewed the work done by her co-workers. The record indicates that her testimony was limited to her expert opinion. Because no out-of-court statements were offered, the challenged testimony was not hearsay. The appellant again argues that the inference of hearsay is prohibited. The enforcement of such a rule would require endless speculation on the part of our trial courts and appellate courts.
The appellant's argument that the jury, through Schultz's testimony, learned that John Vaughn was hired by the defense and could infer that the results of his tests were inculpatory is not supported by the record. There is absolutely no indication in the record that Vaughn was hired by the appellant. There is nothing in the record that discloses Vaughn's results or opinions. Furthermore, it is unlikely that the jury would infer that the appellant hired an expert who was employed by the Jasper Police Department. We note that none of these objections were preserved at the trial court level. Although the failure to properly object does not preclude this court's review, any error must rise to the level of plain error. Even if the court erred in allowing the challenged testimony, the admission of the testimony did not rise to the level of plain error. Kuenzel.
 V
The appellant next contends that his conviction is due to be reversed because the trial court's guilty phase jury charge contained erroneous statements of law. The appellant raises three separate issues under *Page 695 
this subheading. They will be addressed separately below.
 A
The appellant first contends that the trial court's instruction on reasonable doubt violated Cage v. Louisiana,498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), because, like the instruction in Cage, it suggested a higher degree of doubt than is required for an acquittal under the reasonable doubt standard. We disagree. The trial court defined reasonable doubt as follows:
 "The term 'reasonable doubt' is self-defining. It means a doubt that is reasonable, a doubt for which a reason can be given. And by reason the law means a sound, sensible reason. Since this is true a reasonable doubt does not mean an imaginary, a speculative doubt or a fanciful doubt. It means just as it says, a reasonable doubt."
(R. 1195.) Our review of the entire portion of the jury charge concerning the State's burden of proof indicates that the charge was not at all like the charge in Cage and did not in any way lessen the State's burden of proof or transform the reasonable doubt standard into a higher degree of doubt. InCage, the trial court erroneously equated the reasonable doubt standard with a "grave uncertainty" and an "actual substantial doubt." Cage, 111 S.Ct. at 329. By contrast, the trial court in this case properly defined reasonable doubt as being a "sound" and "sensible" reason. The trial court also properly instructed the jury that the defendant could only be convicted if it were convinced of his guilt beyond a reasonable doubt after a full and fair consideration of the evidence. We find no error in the trial court's instruction. See, e.g., People v. Jennings,53 Cal.3d 334, 279 Cal.Rptr. 780, 807 P.2d 1009 (1991), cert.denied, ___ U.S. ___, 112 S.Ct. 443, 116 L.Ed.2d 462 (1991);Lord v. State, 107 Nev. 28, 806 P.2d 548 (1991).
We note that the appellant did not object to this instruction at trial. Although this does not preclude our review, any error must rise to the level of plain error. Even if some portion of the charge had been erroneous, it certainly does not rise to the level required for a finding of plain error. See Ex parteWomack, 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986,104 S.Ct. 436, 78 L.Ed.2d 367 (1983).
 B
The appellant next contends that the trial court's charge on identification was deficient and biased. This argument has no merit. The record reveals that the identification charge to which the appellant now objects was given at the appellant's request. Thus, he is estopped from raising this objection under the doctrine of invited error. Gibson v. State, 555 So.2d 784
(Ala.Crim.App. 1989); Jelks v. State, 411 So.2d 844
(Ala.Crim.App. 1981). Furthermore, we note that the charge did not constitute an erroneous statement of law.
 C
In a one-sentence argument, the appellant next contends that the trial court erred in failing to give his requested charge that the jury was entitled to base a finding of reasonable doubt on character evidence. This argument has no merit because there was no favorable character evidence presented at trial that required such an instruction. Furthermore, the requested instruction was properly refused because it is not a correct statement of law. See Dill v. State, 600 So.2d 343
(Ala.Crim.App. 1991).
 VI
The appellant next contends that his conviction is due to be reversed because black citizens were underrepresented on the jury venire and because the State exercised two of its peremptory strikes to remove black citizens from the jury in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712,90 L.Ed.2d 69 (1986). These arguments will be addressed separately below.
 A
The appellant contends that black citizens constitute 33% of Jefferson County's *Page 696 
population but that black citizens comprised only 26% of the venire from which his jury was selected. He argues that this racial underrepresentation requires that his conviction be reversed. We disagree.
The record is unclear as to how many black jurors were on the venire. The record indicates that the appellant argued at trial that there were five black citizens on the venire; however, the prosecutor and the trial judge indicated that there were eight black citizens on the venire. Thus, the appellant's contention that only 26% of the venire was composed of black citizens may be inaccurate. Even if his calculations are correct, however, he has still failed to establish that there was a systematic exclusion of black jurors from the venire.
In order to establish a prima facie violation of the fair cross-section requirement, the appellant must show "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." Duren v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664,668, 58 L.Ed.2d 579 (1979). "The United States Constitution 'does not require that an exact proportion between the percentage of blacks in the population and those on the jury list. What is required is that no qualified person can be excluded from jury service.' " Jackson v. State, 549 So.2d 616,619 (Ala.Crim.App. 1989) (quoting Butler v. State, 285 Ala. 387,391, 232 So.2d 631 (1970); Butler v. Alabama,406 U.S. 939, 92 S.Ct. 1807, 32 L.Ed.2d 140 (1972). See also Johnson v.State, 502 So.2d 877 (Ala.Crim.App. 1987). The appellant has failed to prove the second and third requirements of Duren. He has failed to show that the representation of blacks on venires from which juries are selected is not fair and reasonable in relation to the number of black citizens in the community or that black citizens have been systematically excluded from the jury selection process. Thus, the appellant's contention must fail. See, e.g., Jackson; Johnson.
The appellant briefly raises three additional issues in a footnote to this section. The appellant contends that his constitutional rights were violated when the prosecutor used his peremptory strikes to remove jurors whose views against the death penalty were not fixed enough to meet the standards set out in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770,20 L.Ed.2d 776 (1968), and Wainwright v. Witt, 469 U.S. 412,105 S.Ct. 844, 83 L.Ed.2d 841 (1985), for a challenge for cause, but whose views were still against the death penalty. This argument has no merit. Although a juror's reservations about the death penalty may not be sufficient for a challenge for cause, his view may constitute a reasonable explanation for the exercise of a peremptory strike. See Fisher v. State,587 So.2d 1027 (Ala.Crim.App. 1991), cert. denied, Ex parte Fisher,587 So.2d 1039 (Ala. 1991). Questions which concern jurors' attitudes regarding the death penalty "are not limited to those questions which would elicit information which would constitute grounds of a challenge for cause." Arthur v. State,472 So.2d 650, 658 (Ala.Crim.App. 1984), rev'd on other grounds,472 So.2d 665 (Ala. 1985) (citation omitted). The appellant's contention that the trial court erred in granting the State's challenge for cause as to a specific juror likewise has no merit. The record reveals that that juror had a fixed opinion against the death penalty.
The appellant's contention that the trial court erred in denying his motion for mistrial because one of the jurors was asleep during a portion of Sergeant Boissel's testimony has no merit. During a hearing on the motion for mistrial, the appellant's attorney stated that one of the jurors had been asleep for approximately 30 minutes. The trial judge stated that he had not noticed this, but that if the juror was asleep, it should have been immediately brought to the court's attention so corrective measures could have been taken. The trial judge stated that when it was brought to his attention, he observed the *Page 697 
juror and did not see any evidence that she was asleep. The decision whether to grant a mistrial is a serious one and is left to the sound discretion of the trial judge. Free v. State,495 So.2d 1147 (Ala.Crim.App. 1986). The trial court's decision will be reversed only for a clear abuse of discretion.Free. We find that the trial court did not abuse its discretion in denying the motion for mistrial.
 B
The appellant argues that the trial court erred in denying his Batson motion because the State exercised two of its peremptory strikes in a racially discriminatory manner. The record reveals that three black jurors were struck from the jury for cause. The State then exercised two of its 19 peremptory strikes to remove black citizens from the jury.
During the Batson hearing, the prosecutor indicated that he struck veniremember no. 113 because the veniremember indicated that he did not believe in the death penalty and that he had a negative view of law enforcement. The veniremember had been previously arrested and handcuffed and believed that he had been treated unfairly by the police. The record clearly indicates that the veniremember had a negative view of the death penalty and of law enforcement. We conclude that the prosecutor's reasons for striking the prospective juror are race neutral. See, e.g., Ex parte Bird v. State, 594 So.2d 676
(Ala. 1991) (juror's reservations about the death penalty sufficient race neutral reason); Smith v. State, 531 So.2d 1245
(Ala.Crim.App. 1987) (same); Stephens v. State, 580 So.2d 11
(Ala.Crim.App. 1990), aff'd, 580 So.2d 26 (Ala. 1991), cert.denied, ___ U.S. ___, 112 S.Ct. 176, 116 L.Ed.2d 138 (1991) (hostile attitude toward law enforcement or dissatisfaction with police is race neutral reason for exercising peremptory strike).
The State removed veniremember no. 173 because he could not follow the bailiff's simple instructions and because the prosecutor perceived him as being incapable of understanding the technical evidence that was going to be presented during the trial. The record supports this perception. The record reveals that the trial judge obviously noticed the veniremember's difficulty in understanding the bailiff's instructions because it was the trial judge who told the prosecutor that the venireman was having difficulty following the instructions. The prosecutor's reasons must be examined in light of all of the relevant circumstances. Allen v. State,555 So.2d 1185 (Ala.Crim.App. 1989). We find that, considering the circumstances and the testimony presented in this case, the prosecutor's reason for removing the juror was race neutral.See, e.g., Scales v. State, 539 So.2d 1074 (Ala. 1988); Gastonv. State, 581 So.2d 548 (Ala.Crim.App. 1991); Mathews v.State, 534 So.2d 1129 (Ala.Crim.App. 1988).
 VII
The appellant next contends that the trial court erroneously admitted evidence of his purported flight and that the trial court's instruction on flight was incorrect. We note that the appellant failed to set out in brief those portions of the evidence relating to flight to which he objects. Furthermore, he failed to object to any evidence of flight during the trial.
 " 'In a criminal prosecution, the State may prove that the accused engaged in flight to avoid prosecution . . . as tending to show the accused's consciousness of guilt. * * * The state is generally given wide latitude or freedom in proving things that occurred during the accused's flight.' 'Evidence of flight is admissible even though it is weak or inconclusive or if several days have passed since the commission of the crime.' Evidence of flight is admissible even though that evidence involves the commission of other crimes by the accused. For the same reason, evidence that the accused resisted or attempted to avoid arrest is admissible."
Ex parte Jones, 541 So.2d 1052, 1055 (Ala. 1989) (quoting Beaverv. State, 455 So.2d 253, 257 (Ala.Crim.App. 1984) (citations omitted)). See also Carlisle v. State, *Page 698 465 So.2d 1205 (Ala.Crim.App. 1984); Bighames v. State,440 So.2d 1231 (Ala.Crim.App. 1983). The admissibility of evidence relating to flight is based on a determination of whether its probative value is outweighed by its prejudicial effect. Exparte Jones. We have carefully reviewed the evidence of flight presented at the trial and find that the probative value of the evidence outweighed its prejudicial effect. We note that the majority of the testimony concerning the appellant's flight came from the appellant himself. The appellant testified that he evaded the police. The accused cannot complain of the admission of improper evidence when he has testified to the same facts. McCall v. State, 501 So.2d 496
(Ala.Crim.App. 1986). We find that the evidence of flight was properly admitted. Furthermore, we see no error in the trial court's jury instruction concerning flight. Even if any error had occurred in the admission of the evidence or in the trial court's instruction, it certainly did not rise to the level of plain error. Ex parte Womack; Kuenzel.
The appellant argues in a footnote that the trial court improperly admitted evidence of uncharged crimes that he allegedly committed during his attempts to evade the police. This argument has no merit. Such evidence was properly admitted as part of the flight evidence. Ex parte Jones. Furthermore, the appellant cannot complain that evidence which was admitted through his own testimony constituted error. McCall.
 VIII
The appellant next contends that the trial court erred in admitting several items of evidence because, he says, the State failed to prove a proper chain of custody for each of the items. These items include a door handle (Exhibit No. 35), a door threshold (Exhibit No. 36), bloodstained gauze (Exhibit Nos. 43A, 34B and 34C), a hammer (Exhibit No. 55), fingerprints taken from the rear door (Exhibit Nos. 68A and 68B), a storm door (Exhibit No. 39), a stained check (Exhibit No. 62), a stained deposit slip (Exhibit No. 63) and a stained purse fragment (Exhibit No. 64). We note that Exhibit Nos. 55, 62, 63, and 64 were not admitted into evidence. Furthermore, with the exception of Exhibit No. 39, the storm door, the appellant entered no objections regarding the chain of custody when any of the exhibits was offered into evidence.
 "The purpose for requiring that the chain of custody be shown is to establish to a reasonable probability that there has been no tampering with the evidence. 'The evidence need not negate the most remote possibility of substitution, alteration or tampering with the evidence, but rather must prove to a reasonable probability that the item is the same as, and not substantially different from, the object as it existed at the beginning of the chain.' "
Ex parte Williams, 505 So.2d 1254, 1255 (Ala. 1987) (quoting this court in Williams, 505 So.2d at 1253).
We have carefully reviewed the record as to each admitted item of evidence and find that the State proved a sufficient chain of custody as to each item. We find that the State established to a reasonable certainty that none of the items had been altered, substituted, or tampered with. Furthermore, even if any of the items had been erroneously admitted, any error was harmless because none of the challenged evidence was inculpatory. See Musgrove v. State, 519 So.2d 565
(Ala.Crim.App.), aff'd, 519 So.2d 586 (Ala. 1986), cert. denied,486 U.S. 1036, 108 S.Ct. 2024, 100 L.Ed.2d 611 (1988) (harmless error rule applies in capital cases).
 IX
The appellant next contends that the evidence was insufficient to sustain the verdict and that the trial court's instruction concerning the capital offense of murder during a robbery was insufficient. These arguments will be addressed separately below.
 A
The appellant contends that the evidence was insufficient to support the *Page 699 
verdict because the State failed to prove that the murder of Emma Whitehead was committed during the robbery of Ruby Brown. He contends that the State failed to prove that the robbery was anything other than a mere afterthought that occurred subsequent to the murder of Whitehead. He also argues that there was no evidence from which the jury could infer that he intended to rob Brown before he killed Whitehead. This argument has no merit.
 "To sustain a conviction under § 13A-4-40(a)(2) for capital robbery-murder, the state must prove beyond a reasonable doubt: (1) a 'robbery in the first degree or an attempt thereof,' as defined by § 13A-8-41; (2) a 'murder,' as defined by § 13A-6-2(a)(1); and that the murder was committed 'during' the robbery, i.e., that the murder was committed 'in the course of or in connection with the commission of, or in immediate flight from the commission of' the robbery or attempted robbery in the first degree, § 13A-5-39(2). Connolly v. State, 500 So.2d 57
(Ala.Crim.App. 1985), aff'd, 500 So.2d 68 (Ala. 1986). The capital crime of robbery when the victim is intentionally killed is a single offense beginning with the act of robbing or attempting to rob and culminating in the act of intentionally killing the victim; the offense consists of two elements, robbing and intentional killing. Davis v. State, 536 So.2d 110
(Ala.Crim.App. 1987); Magwood v. State, 494 So.2d 124
(Ala.Crim.App. 1985), aff'd, Ex parte Magwood, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986). The intentional murder must occur during the course of the robbery in question; however, the taking of the property of the victim need not occur prior to the killing. Clark v. State, 451 So.2d 368 (Ala.Crim.App.), cert. denied, 451 So.2d 368 (Ala. 1984). While the violence or intimidation must precede or be concomitant with the taking, it is immaterial that the victim is dead when the theft occurs. Thomas v. State, 460 So.2d 207 (Ala.Crim.App. 1983), aff'd, 460 So.2d 216 (Ala. 1984).
 " 'As the Alabama Supreme Court held in Cobern v. State, 273 Ala. 547, 142 So.2d 869
(1962), "the fact that the victim was dead at the time the property was taken would not militate [against a finding] of robbery if the intervening time between the murder and the taking formed a continuous chain of events." Clements v. State, 370 So.2d 708, 713 (Ala.Crim.App. 1978), aff'd in pertinent part, 370 So.2d 723 (Ala. 1979); Clark v. State, 451 So.2d 368, 372
(Ala.Crim.App. 1984). To sustain any other position "would be tantamount to granting to would-be robbers a license to kill their victims prior to robbing them in the hope of avoiding prosecution under the capital felony statute." Thomas v. State, 460 So.2d 207, 212
(Ala.Crim.App. 1983), aff'd, 460 So.2d 216 (Ala. 1984).
 " 'Although a robbery committed as a "mere afterthought" and unrelated to the murder will not sustain a conviction under § 13A-5-40(a)(2) for the capital offense of murder-robbery, see Bufford v. State, supra [382 So.2d 1162
(Ala.Cr.App. 1980)]; O'Pry v. State, supra [642 S.W.2d 748 (Tex.Crim.App. 1981)], the question of the defendant's intent at the time of the commission of the crime is usually an issue for the jury to resolve. Crowe v. State, 435 So.2d 1371, 1379 (Ala.Crim.App. 1983). The jury may infer from the facts and circumstances that the robbery began when the accused attacked the victim and the capital offense was consummated when the defendant took the victim's property and fled. Cobern v. State, 273 Ala. 547, 550, 142 So.2d 869, 871 (1962). The defendant's intent to rob the victim can be inferred where "[t]he intervening time, if any, between the killing and robbery was part of a continuous chain of events." Thomas v. State, 460 So.2d 207, 212
(Ala.Crim.App. 1983), aff'd, 460 So.2d 216
(Ala. 1984). See also Cobern v. State, 273 Ala. 547, 142 So.2d 869 (1962); Crowe v. State, 435 So.2d 1371 (Ala.Crim.App. 1983); Bufford *Page 700 v. State, 382 So.2d 1162 (Ala.Crim.App.), cert. denied, 382 So.2d 1175 (Ala. 1980); Clements v. State, 370 So.2d 708 (Ala.Crim.App. 1978), aff'd in pertinent part, 370 So.2d 723 (Ala. 1979).'
"Connolly, 500 So.2d at 63."
Hallford v. State, 548 So.2d 526, 534-35 (Ala.Crim.App. 1988),aff'd, 548 So.2d 547 (Ala. 1989), cert. denied, 493 U.S. 945,110 S.Ct. 354, 107 L.Ed.2d 342 (Ala. 1989). The capital offense of robbery-murder encompasses a robbery-murder in which the person murdered is not the same as the victim of the robbery.Taylor v. State, 442 So.2d 128 (Ala.Crim.App. 1983). The record indicates that the robbery and murder formed a continuous chain of events. See, e.g., Smelley v. State,564 So.2d 74 (Ala.Crim.App.), cert. denied, 564 So.2d 89
(Ala. 1990); Clark v. State, 451 So.2d 368
(Ala.Crim.App. 1984); Taylor. There was more than sufficient evidence for the jury to find that the appellant murdered Emma Whitehead during a first degree robbery of Ruby Brown and that the appellant had the intent to commit a capital offense.
 B
The appellant contends that the trial court failed to adequately instruct the jury that the murder of Emma Whitehead had to occur "during" the robbery of Ruby Brown. He contends that the trial court erred in failing to instruct the jury that he must have intended to commit a robbery prior to his assault of Whitehead. He also claims that the instructions were ambiguous because, he says, when the court referred to the robbery, it was unclear whether the court was referring to the robbery of Brown or an attempted robbery of Whitehead. The appellant failed to object to the trial court's jury instructions and although this does not preclude our review under the doctrine of plain error, it does weigh against him as to any claim of prejudice. Ex parte Kennedy, 472 So.2d 1106
(Ala. 1985), cert. denied, 474 U.S. 975, 106 S.Ct. 340,88 L.Ed.2d 325 (1985). We have carefully reviewed the trial court's instructions in light of the appellant's arguments and find no error. The court properly charged the jury on the elements of the capital offense of murder committed during the course of a robbery.
 X
The appellant contends that his conviction is due to be reversed because the trial court failed to instruct the jurysua sponte on reckless murder and felony-murder as lesser included offenses of capital murder. We note that the appellant neither requested such instructions at the trial nor objected to the court's oral charge as given. Although this does not preclude our review under the doctrine of plain error, it does weigh against any claim of prejudice. Ex parte Kennedy;Kuenzel.
"A trial judge may refuse to charge on the lesser included offense when it is clear to the judicial mind that there is no evidence to support the jury's being charged on the lesser included offense." Gurganus v. State, 520 So.2d 170, 174
(Ala.Crim.App. 1987). See also Greer v. State, 475 So.2d 885, 890
(Ala.Crim.App. 1985); Kennedy v. State, 472 So.2d 1092
(Ala.Crim.App. 1984), aff'd, 472 So.2d 1106 (Ala. 1985), cert.denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985).
Reckless murder occurs when "[u]nder circumstances manifesting extreme indifference to human life, [the defendant] recklessly engages in conduct which creates a grave risk of death to a person other than himself, and thereby causes the death of another person." Ala. Code § 13A-6-2(a)(2) (1975). Reckless homicide embraces those cases in which a person does not have a deliberate intent to kill a specific individual. Exparte Washington, 448 So.2d 404 (Ala.Crim.App. 1984). The appellant was not entitled to a charge on reckless murder because there was absolutely no evidence that he acted recklessly within the meaning of the statute. All of the evidence indicates that the appellant specifically intended to murder Emma Whitehead. The record reveals that the appellant brutally beat Whitehead and then set fire to her house. There is absolutely no evidence in the record that would support *Page 701 
a finding that the appellant committed a reckless murder.
A felony-murder is committed when a person commits or attempts to commit one of several enumerated felonies and in the course of or in furtherance of the crime or in flight from the crime, he causes another person's death. Ala. Code §13A-6-2(a)(3). "In the typical felony-murder, there is no malice in 'fact,' express or implied; the malice is implied by the 'law.' What is involved is an intended felony and an unintended homicide." Ex parte Bates, 461 So.2d 5, 7 (Ala. 1984) (citation omitted). There was likewise no basis in the evidence that would support a finding by the jury that the appellant committed felony-murder. The record indicates that the appellant brutally beat Whitehead. She received at least 16 severe blows to her head and at least seven blows to her body. Her house was set on fire shortly after she was beaten. The only reasonable conclusion from the evidence was that the appellant acted with the intent to murder Whitehead.
We further note that the trial court did not err in charging the jury on reckless murder and felony-murder because the appellant relied on an alibi defense. "Clearly, if the jury believes [the appellant], he must have been found not guilty; if they believed the prosecution's evidence, he must have been found guilty of the crime charged." Gurganus at 175 (citations omitted). See also Ex parte Julius, 455 So.2d 984 (Ala. 1984),cert. denied, 469 U.S. 1132, 105 S.Ct. 817, 83 L.Ed.2d 809
(1985); Mullis v. State, 545 So.2d 205 (Ala.Crim.App. 1989).
 XI
The appellant next contends that his conviction is due to be reversed because the State engaged in prosecutorial misconduct during the guilt stage closing arguments. The appellant argues that the prosecutor vouched for his witnesses and injected unsworn testimony, distracted the jury from the issue of identification, and misstated the law.
We initially note that none of the appellant's objections were raised at the trial court level. While this does not preclude our review under the doctrine of plain error, the plain error doctrine should be applied only to particularly egregious errors which seriously affect the fairness and integrity of the judicial proceedings. Kuenzel; Bankhead v.State, 585 So.2d 97 (Ala.Crim.App. 1989), aff'd, Ex parteBankhead, 585 So.2d 112 (Ala. 1991). "This court has concluded that the failure to object to improper prosecutorial arguments . . . should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful." Kuenzel at 489 (quoting Johnson v. Wainwright,778 F.2d 623, 629 n. 6 (11th Cir. 1985), cert. denied, 484 U.S. 872,108 S.Ct. 201, 98 L.Ed.2d 152 (1987)).
"[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." United States v. Young,470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985). We will review the appellant's specific allegations of error separately below.
1. We find no impropriety in the prosecutor's comment that he knew who the guilty party was, that the appellant knew who the guilty party was, and that each of the jurors knew who the guilty party was. The record reveals that the prosecutor went over, in detail, all the evidence that pointed to the appellant's guilt. He then simply argued that all of that evidence warranted a verdict of guilty. During the challenged portion of his closing argument, the prosecutor also stated that the jury had to weigh the evidence and decide whether Rickey Lee Johnson had committed the offense. It was in this context that the prosecutor stated who the guilty party was. In closing arguments, a prosecutor may argue that the evidence presented proves the guilt of the accused. Galloway v. State,484 So.2d 1199 (Ala.Crim.App. 1986). It is not improper for a *Page 702 
prosecutor to argue or to express an opinion that the accused is guilty when he states, or it is apparent that, his opinion is based solely on the evidence. Galloway. Even if this comment could have been considered improper, any error certainly did not rise to the level of plain error. Kuenzel. Furthermore, the trial court repeatedly instructed the jury that it was the sole factfinder in the case and that only it could determine the guilt or innocence of the accused.
2. The appellant claims that the prosecutor injected unsworn testimony into the case by referring to his recollection of a male nurse who had treated his father when he was in the hospital several years earlier. This argument has no merit. The record reveals that, while discussing Ruby Brown's identification of the appellant, the prosecutor argued that there is a difference between what a person sees in her mind and what that person can put down on paper. The prosecutor referred to his father's hospitalization simply as a means of illustrating his point while in the process of properly drawing his conclusions from the evidence. In Clency v. State,475 So.2d 642, 644 (Ala.Crim.App. 1985), this court stated, "It is common knowledge, of which we take judicial notice, that human beings can recognize and identify other human beings with considerable accuracy, even though they cannot give a clinical description of their height, weight, age, dress, or combination of facial features." We find no error in the prosecutor's comments. While a prosecutor should avoid comment on matters that are not supported by the evidence, we do not interpret the prosecutor's comments here as an effort to cajole the jury into reaching a verdict on the basis of the prosecutor's importance or credibility. Kuenzel at 491. Even if his comments were erroneous, any error certainly did not rise to the level of plain error. Kuenzel.
3. The appellant argues that the prosecutor deliberately misstated the evidence during his closing argument. This argument has no merit. Each statement to which the appellant objects was supported by the evidence.
4. The appellant also contends that the prosecutor improperly persisted in distracting the jury from the central issue of Ruby Brown's identification. He specifically points to the following comments made by the prosecutor: that the deceased was a "kind lady" (R. 1124); "But we don't know what her last thoughts were as she is laying there and can't do anything about her plight" (R. 1185); that he referred to the "animalistic nature of the human mind" (R. 1190); that this offense was "absolutely filthy, horrendously dirty and despicable" (R. 1144); and that he questioned whether Ruby Brown was "making this all up." (R. 1174). We have reviewed all of the challenged comments in the context in which they were made and find that none of them constituted error. The comments were either proper statements of the evidence, proper inferences from the evidence, or conclusions that were properly drawn from the evidence. See Johnson v. State, 541 So.2d 1112
(Ala.Crim.App. 1989). Even if any of the comments constituted error, they did not rise to the level of plain error. Ex parteWomack; Kuenzel.
5. The appellant also argues that the prosecutor misstated the law by asking the jury not to consider a lesser included offense, misrepresenting the nature of capital murder, and redefining the reasonable doubt standard as requiring "sound and solid reasons." (R. 1141.) This argument has no merit. We have reviewed the challenged statements in the context of the closing arguments and find that the prosecutor did not misstate the law. Furthermore, the trial court properly instructed the jury on the law to be applied in the case. Even if error had occurred, none of the challenged comments rose to the level of plain error. Ex parte Womack; Kuenzel.
6. In a brief footnote, the appellant argues that the trial court erred in denying his motion for mistrial when one of the prosecutors laughed during the appellant's testimony. The determination of whether to grant a mistrial lies within the discretion of the trial court and will be reversed only for a clear abuse of that *Page 703 
discretion. Free v. State, 495 So.2d 1147
(Ala.Crim.App. 1986). We have carefully reviewed the record and find no such abuse here.
7. In another brief footnote, the appellant argues that the State's focus on Ruby Brown's and Emma Whitehead's character constituted reversible error pursuant to Booth v. Maryland,482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) and SouthCarolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207,104 L.Ed.2d 876 (1989). This argument has absolutely no merit.
 XII
The appellant next contends that his sentence is due to be reversed because of several instances of prosecutorial misconduct during the sentencing stage closing arguments. We initially note that the appellant failed to object to many of the comments he now challenges in brief. Although this does not preclude our review under the doctrine of plain error, the appellant's failure to object does weigh against any claim of prejudice. Ex parte Kennedy; Kuenzel. The appellant's specific arguments will be addressed separately below.
1. The appellant first contends that his sentence is due to be reversed because the prosecutor improperly stated that the appellant was not a civilized human being and compared him to a rabid dog. "In a proper case, the prosecuting attorney may characterize the accused or his conduct in language which, although it consists of invective or opprobrious terms, accords with the evidence of the case." Nicks v. State, 521 So.2d 1018,1023 (Ala.Crim.App. 1987), aff'd, 521 So.2d 1035 (Ala.), cert.denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988).See also Holladay v. State, 549 So.2d 122
(Ala.Crim.App. 1988), aff'd, 549 So.2d 135 (Ala.), cert. denied,493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989). The evidence reveals that Emma Whitehead and Ruby Brown were brutally beaten. Their home was then set on fire. Although we do not necessarily approve of the particular language used by the prosecutor, the comments did accord with the evidence in the case. See, e.g., Holladay; Bankhead; Vinson v. State,432 So.2d 1 (Ala.Crim.App. 1983). Even if any of the comments were improper, we do not believe that they might have unduly influenced the jury in arriving at its verdict of the death penalty. There was overwhelming evidence of guilt, and the aggravating circumstances were clearly supported by the record.
2. The appellant contends that the prosecutor improperly expressed his personal opinion that the death penalty was the only appropriate sentence in the case. This claim has no merit. A review of the three challenged comments indicates that they were not expressions of the prosecutor's personal opinion, but rather that they were proper comments concerning the conclusion to be drawn from the evidence. See Sams v. State,506 So.2d 1027 (Ala.Crim.App. 1986). The prosecutor properly urged that a death sentence was appropriate, based on all of the evidence. We note that the appellant did not object to these allegedly improper comments. Although this does not preclude our review in a capital case, it does weight against any claim of prejudice. Kuenzel. Even if any of the comments were improper, however, there was no plain error.
3. The appellant also contends that the prosecutor's expressions of personal opinion regarding the death penalty violated Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633,86 L.Ed.2d 231 (1985), because they reduced the jury's sense of responsibility for imposition of the death penalty. This claim has no merit. Caldwell v. Mississippi stands for the proposition that it is error when the jury is given reason to believe that the responsibility for determining the appropriateness of the death sentence rests elsewhere. There was nothing in the challenged comments that would have led the jury to believe that the responsibility for imposing the death sentence was not the jury's responsibility.
4. The appellant argues that the prosecutor erred in presenting unsworn testimony when he was explaining the nature *Page 704 
of the "especially heinous, atrocious or cruel" aggravating circumstance. He specifically contends that the prosecutor improperly referred to a typical "handy pack" robbery-murder as an example of a capital case which is not especially heinous, atrocious or cruel. We disagree. The prosecutor was drawing on the common sense and common knowledge of the jury to argue that Emma Whitehead's murder was different from other types of capital murder cases because of the brutal nature of the crime. We note that the appellant did not object to this argument at trial and that the jury was instructed that the arguments of counsel are not evidence. Even if the comments were improper, they certainly did not rise to the level of plain error.
5. The appellant next contends that the prosecutor improperly raised six nonstatutory aggravating circumstances during his penalty phase closing argument. He contends that these included the danger the appellant would represent in the future, his lack of remorse, the fact that he committed perjury, the fact that he committed arson when he set the house on fire, his crimes against Ruby Brown, and his flight from the police. He also briefly claims in a footnote that the prosecutor's "rabid dog" argument suggested that the penalty of life without parole was nonexistent and that the appellant would be released from prison. We initially note that the appellant did not object to any of these comments at trial. While this does not preclude our review under the doctrine of plain error, it does weigh against any claim of prejudice. Ex parte Kennedy; Kuenzel.
We have carefully reviewed the record and conclude that the appellant's claims are not supported by the record. The record reveals that during his opening statement to the jury at the penalty phase of the trial the prosecutor clearly told the jury that the State was proceeding under two aggravating circumstances: (1) the capital offense was committed while the defendant was engaged in a robbery and (2) the capital offense was especially heinous, atrocious, or cruel when compared to other capital crimes. He further stated that "it will be those two aggravating circumstances that we are going to ask you to consider in making your decision." (R. 1246.)
The record reveals that the prosecutor's "rabid dog" comment was not an argument concerning the appellant's future dangerousness, but was a comment on the especially heinous and atrocious nature of the crime. Furthermore, his comments in no way suggested that life without parole was nonexistent and that the appellant would be released from prison.
The prosecutor's argument that the appellant showed no remorse was a reply to the appellant's argument in which he asked for mercy. The prosecutor was not suggesting that the lack of remorse was an aggravating circumstance.
The prosecutor's argument regarding the beating and robbery of Ruby Brown and the arson was also proper because it was relevant to the statutory aggravating circumstances relied on by the State. The State had to prove that the murder occurred during the robbery of Brown as alleged in the indictment. The beating of Brown and the arson were relevant to the especially heinous, atrocious, or cruel aggravating circumstance. The prosecutor's argument regarding the appellant's flight from the police, which was amply grounded in the evidence, was also proper. The appellant's contention that the prosecutor improperly argued that the appellant committed perjury also has no merit.
6. The appellant contends in a one-sentence footnote that the prosecutor's argument during the penalty phase closing argument regarding flight was an improper comment on his right to remain silent. This argument has no merit. The general principle that a prosecutor cannot comment on an accused's failure to testify does not apply in this case because the appellant testified on his own behalf. The prosecutor did not comment on the appellant's right to remain silent. He simply brought out the evidence of flight which we have already held was properly admitted at the trial. *Page 705 
7. The appellant contends that the prosecutor improperly suggested to the jury that some of the mitigating circumstances would be unworthy of consideration. This argument has no merit. The prosecutor properly told the jury that the trial judge would instruct it on the applicable mitigating circumstances. Even if the prosecutor's comments could be interpreted as encouraging the jury to give the evidence of mitigation no weight, those comments did not constitute reversible error. The trial court correctly instructed the jury as to the relevant mitigating circumstances and the weighing process. The jury was also instructed that the arguments of counsel were not evidence.
8. The appellant argues in a brief footnote that the prosecutor erred in inviting the jury to abandon the weighing process and to weigh the suffering of Emma Whitehead against the suffering the appellant should face. We have reviewed the challenged comments and the context in which they were made, and we disagree. The prosecutor was simply replying to an argument made by defense counsel and did not urge the jury to abandon the statutorily required balancing of aggravating and mitigating circumstances.
9. In another one-sentence footnote argument, the appellant states that the prosecutor misrepresented the evidence during his penalty phase closing argument. Both the prosecutor and defense counsel have the right to present their impressions from the evidence and may argue any legitimate inference therefrom. Ex parte Ainsworth, 501 So.2d 1269 (Ala. 1986). The appellant's claim has no merit.
 XIII
The appellant contends that the trial court erred in refusing to consider and in failing to find statutory and nonstatutory mitigating circumstances in violation of Lockett v. Ohio,438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). He argues that the trial court also erroneously considered a prior arrest for possession of marijuana, which was nolle prossed, and three pending felony charges. He also contends that the trial court erred in refusing to allow him to present witnesses who would have testified concerning mitigating circumstances in the form of character evidence. These arguments have no merit.
The record reveals that the trial court fully considered the evidence presented in support of mitigation. The trial court did not violate Lockett by failing to find that the evidence did not mitigate the appellant's crime. "While Lockett and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority."Bankhead v. State, 585 So.2d 97 (Ala.Crim.App. 1989), aff'd,Ex parte Bankhead, 585 So.2d 112 (Ala. 1991) (citations omitted). Neither Lockett nor Eddings v. Oklahoma,455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), establishes the weight that the trial court must give to evidence presented in support of mitigation. Johnson v. Wainwright, 806 F.2d 1479 (11th Cir. 1986), cert. denied, 484 U.S. 872, 108 S.Ct. 205,98 L.Ed.2d 157 (1987). The trial court is not required to find the existence of a mitigating circumstance simply because the accused proffers evidence of a mitigating circumstance.Thompson v. State, 503 So.2d 871 (Ala.Crim.App. 1986), aff'd,503 So.2d 887 (Ala. 1987), cert. denied, 484 U.S. 872,108 S.Ct. 204, 98 L.Ed.2d 155 (1987); Harrell v. State, 470 So.2d 1303
(Ala.Crim.App. 1984), aff'd, 470 So.2d 1309 (Ala.), cert.denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).
The record indicates that the trial judge did consider the evidence that the appellant presented in support of mitigation, but found that evidence to be insufficient to outweigh the two aggravating circumstances. The trial court clearly considered the fact that the appellant did not have a prior, significant criminal history and found this to be a mitigating circumstance. The trial court also considered the other alleged mitigating factors and found that no other mitigating circumstance was present. The record also clearly indicates that the trial court did not consider a prior arrest, which *Page 706 
was nolle prossed, or any pending criminal charges.
The appellant's claim that he was not given the opportunity to present character evidence in support of mitigation also has no merit. The appellant did not indicate that he had any objection to proceeding with the penalty phase of his trial when the trial court indicated that the penalty phase would begin the morning following his conviction. The next morning, the appellant moved for a continuance because he could not locate his two character witnesses. Neither of the witnesses had been subpoenaed. After hearing the nature of the testimony, the trial court denied the motion for continuance.
A determination of whether to grant a continuance is within the trial court's discretion. Nance v. State, 416 So.2d 437
(Ala.Crim.App. 1982). The trial court's determination will not be reversed absent a gross abuse of discretion. Sales v. State,446 So.2d 703 (Ala.Crim.App. 1983); Nance. We find no such abuse of discretion. A review of the proffered testimony leads us to the conclusion that the jury would not have been influenced by the testimony in light of the heinous nature of the crime. Furthermore, the appellant was given the opportunity to present the evidence at the sentencing hearing that was held before the trial court at a later date, but failed to do so.
 XIV
The appellant next contends that the trial court's references to the jury's sentence as "advisory" and a "recommendation" constituted error pursuant to Caldwell v. Mississippi,472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), because, he says, those references unconstitutionally led the jury to believe that the responsibility for determining the appropriateness of the death penalty rested elsewhere. He also claims that the prosecutor's references to the jury's sentence as "advisory" during the State's argument were also error. We initially note that the appellant made no objection to these references at the trial court level. Although this failure to object does not preclude our review under the doctrine of plain error, it does weigh against any claim of prejudice. See Bankhead; Kuenzel.
"[T]he comments of the prosecutor and the instructions of the trial court accurately informing a jury of the extent of its sentencing authority and that its sentence verdict was 'advisory' and a 'recommendation' and that the trial court would make the final decision as to sentence does not violateCaldwell." Kuenzel at 502 (quoting Martin v. State,548 So.2d 488, 494 (Ala.Crim.App. 1988), aff'd, 548 So.2d 496
(Ala. 1989), cert. denied, 493 U.S. 970, 110 S.Ct. 419,107 L.Ed.2d 383 (1989)). See also Smith v. State, 581 So.2d 497
(Ala.Crim.App. 1990), rev'd on other grounds, 581 So.2d 531
(Ala. 1991). We have carefully reviewed the trial court's instructions and the prosecutor's challenged comment and find that neither constituted error. The trial court's instructions and the prosecutor's comment accurately informed the jury of its sentencing authority and in no way minimized the jury's role and responsibility in sentencing. See, e.g., Smith;Kuenzel; Martin.
The appellant next contends that the trial court erred in denying his motion for a fully sequestered voir dire. We disagree.
"Even in capital cases, there is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination, and it is within the trial court's discretion whether to allow such a request."Hallford v. State, 548 So.2d 526, 538 (Ala.Crim.App. 1988),aff'd, 548 So.2d 547 (Ala. 1989) cert. denied, 493 U.S. 945,110 S.Ct. 354, 107 L.Ed.2d 342 (Ala. 1989). See also Whisenhant v.State, 555 So.2d 219 (Ala.Crim.App. 1988), aff'd,555 So.2d 235 (Ala. 1989) cert. denied, 496 U.S. 943, 110 S.Ct. 3230,110 L.Ed.2d 676 (Ala. 1990). The trial court's determination will not be reversed absent an abuse of discretion. Kuenzel;Hallford. The record reveals that no evidence of any prejudicial pretrial publicity was presented to the trial court. The appellant was also given the opportunity to individually question *Page 707 
those potential jurors who indicated that they had heard something about the case. There is no indication in the record that there was any pretrial publicity in the case that gave rise to a significant possibility of prejudice. The trial court did not err in denying the appellant's motion. See, e.g.,Kuenzel.
 XVI
The appellant next contends that the trial court committed reversible error during its penalty phase instructions. He claims that the trial court's instructions on reasonable doubt were erroneous under Cage v. Louisiana, 498 U.S. 39,111 S.Ct. 328, 112 L.Ed.2d 339 (1990); that the trial court erred in instructing the jury on the especially heinous, atrocious, or cruel aggravating circumstance; and that the trial court erred in referring to the jury's sentence as advisory and a recommendation. We have previously addressed and rejected the appellant's contention concerning the reasonable doubt standard in part V-A of this opinion. The same reasoning applies here. We have also previously held that the trial court did not err in referring to the jury's sentence as advisory in part XIV of this opinion.
The appellant argues that the trial court should not have instructed the jury on the especially heinous, atrocious, or cruel aggravating circumstance because the jury was not given any capital cases with which to compare the appellant's crime. This argument has been previously addressed and rejected inEx parte Bankhead, 585 So.2d 112 (Ala. 1991). The trial court clearly followed the standard set out in Ex parte Kyzer,399 So.2d 330 (Ala. 1981), and properly instructed the jury on the especially heinous, atrocious, or cruel aggravating circumstance. The appellant's contention that the trial court erred because it failed to emphasize that only the torture inflicted on Emma Whitehead and not that inflicted on Ruby Brown could be considered in the context of the especially heinous, atrocious, or cruel aggravating circumstance also has no merit. The jury was properly instructed on this aggravating circumstance.
 XVII
The appellant next contends that the trial court's instructions on the especially heinous, atrocious, or cruel aggravating circumstance were erroneous and that the evidence did not support a finding of the existence of this aggravating circumstance. He also claims that the especially heinous, atrocious, or cruel aggravating circumstance has been unconstitutionally applied in Alabama. The appellant's first contention, that the trial court's instructions were erroneous, was previously addressed and rejected in part XVI of this opinion.
The appellant's claim that the evidence did not support a finding that the crime was especially heinous, atrocious, or cruel has no merit. In order for a capital crime to be considered especially heinous, atrocious, or cruel, the capital murder must be one of "those conscienceless or pitiless homicides which are unnecessarily torturous to the victim."Ex parte Kyzer, 399 So.2d at 334. The evidence indicates that Emma Whitehead received 16 severe blows to her head. She also received at least seven blows to her body. There was also evidence presented that the appellant had attempted to strangle her. This was evidenced by hemorrhaging in her eye area. The appellant set the house on fire. The evidence reveals that Whitehead also inhaled an appreciable amount of dense smoke before she died. The evidence clearly supports a finding that the capital crime was especially heinous, atrocious, or cruel.
The appellant's contention that the especially heinous, atrocious, or cruel aggravating circumstance is unconstitutionally applied in Alabama also has no merit. Alabama courts have consistently applied this aggravating circumstance only to cases involving unnecessary torture.See, e.g., Whisenhant v. State, 555 So.2d 219
(Ala.Crim.App. 1988), aff'd, 555 So.2d 235 (Ala. 1989) cert. denied,496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990); Thompson v.State, 542 So.2d 1286 (Ala.Crim.App. 1988), aff'd,542 So.2d 1300 (Ala.), cert. *Page 708 denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989);Grayson v. State, 479 So.2d 69 (Ala.Crim.App. 1984), aff'd,479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189,88 L.Ed.2d 157 (1985); Kennedy v. State, 472 So.2d 1092
(Ala.Crim.App. 1984), aff'd, 472 So.2d 1106 (1985), cert.denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985).
The appellant's argument in a brief footnote that the court's literal reading of § 13A-5-49(8), Code of Alabama 1975, permitted the jurors to agree on aggravation based on differing findings and thus subverted the unanimity requirement has no merit. The jury was properly instructed that in order to find the existence of the especially heinous, atrocious, or cruel aggravating circumstance, it had to unanimously agree that the murder was unnecessarily torturous.
 XVIII
The appellant next contends that the limitations placed on compensation for court-appointed counsel are unconstitutional. He claims that those limitations constitute an unconstitutional taking of defense counsel's property and deprive the defendant of the effective assistance of counsel. These claims have been previously addressed and rejected in Smith v. State,581 So.2d 497 (Ala.Crim.App. 1990), rev'd on other grounds,581 So.2d 531 (Ala. 1991), and in Bankhead v. State.
 XlX
The appellant argues that the trial court erred in denying his motion for a continuance at the trial stage because he needed time to locate a defense witness, Herron (Junior) Calhoun. This argument has no merit. A determination of whether to grant a continuance is in the trial court's discretion and will not be reversed absent a clear abuse thereof. Sales v.State, 446 So.2d 703 (Ala.Crim.App. 1983). Furthermore, the record reveals that Herron Calhoun testified on behalf of the appellant at trial. Thus, the appellant suffered no prejudice.
 XX
As required by Beck v. State, 396 So.2d 645 (Ala. 1980), and §13A-5-53, Code of Alabama, 1975, we have reviewed this case for any error involving the appellant's conviction and to determine the propriety of the death sentence.
There is no suggestion in the record that the death penalty was imposed under the influence of passion, prejudice, or any other arbitrary factor. Our review of the sentencing proceedings indicates that the trial court's findings concerning the aggravating and mitigating circumstances are supported by the record. The trial court found two aggravating circumstances: (1) that the murder was committed during a robbery in the first degree and (2) that the capital offense was especially heinous, atrocious, or cruel when compared to other crimes. After considering each of the statutory mitigating circumstances set out in § 13A-5-51 and the possibility of any nonstatutory mitigating circumstances as provided in § 13A-5-52, the trial court found the existence of one mitigating circumstance. The trial court found as a mitigating circumstance that the appellant had no significant history of prior criminal activity. These findings were supported by the evidence. See Brownlee v. State, 545 So.2d 151
(Ala.Crim.App. 1988), aff'd, 545 So.2d 166 (1989).
Our independent weighing of the aggravating and mitigating circumstances convinces us of the propriety of the death penalty in this case. Furthermore, we are convinced that the death penalty is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crime and the appellant. Two-thirds of Alabama death sentences are for the offense of robbery-murder. Kuenzel; Brownlee.
We have searched the entire record for any plain error or defect which might have adversely affected the substantial rights of the appellant and have found none. A.R.App.P. 45A. *Page 709 
The appellant's conviction and his sentence of death are due to be, and they hereby are, affirmed.
AFFIRMED.
All the Judges concur.